CUDE et al. v. CULBERSON et al.—209 S. W. (2d) 506.

Western Section. June 27, 1947.

Petition for Certiorari denied by Supreme Court, January 16, 1948.

632

Miles & Miles and Hudgins & Hudgins, all of Union City, for plaintiffs in error.

Heathcock & Elam, of Union City, for defendants in error.

ANDERSON, P. J. This was an issue of devisavit vel non. The alleged will purported to be that of W. C. Culberson. It was challenged on the ground of mental incapacity and undue influence exercised by the beneficiaries thereunder. The verdict was against the will, and judgment was entered accordingly. The proponents appealed in error.

The testator was a farmer living near Troy, in Obion County, Tennessee. He died in February, 1946, at the age of 76, leaving an estate consisting of farm lands and personal property of the value of some $55,000.00 to $60,-000.00. He was survived by his wife, two daughters, Mrs. Maud Cude and Mrs. Mary .Cude, one son, D. A. Culberson, referred to in the record as Alex. Culberson, and one grandson, William Edward Reece, a minor about ten years of age. The latter is the son of a daughter who predeceased the testator. Her given name was Willie B. She intermarried with Willis Reece. She died April 3, 1936, survived by her husband and the one child. The contestants are the testator's son, Alex. Culberson, and

the minor grandchild, William Edward Reece acting by his father and next friend, Willis Reece. The proponents are James R. Cude and A. C. Cude, who qualified as administrators with the will annexed, and who are the husbands of the testator's two daughters. The latter and the widow likewise joined as proponents.

The alleged will, as originally executed, bears date of February 12, 1930. There are two codicils, the first dated July 18, 1936, and the second, May 8, 1945.

By the will as originally published, the testator gave to his wife for life the farm on which they then lived, with the remainder to his three daughters equally. In addition, he gave her $3000.00 in cash, the household goods, live stock and farming implements. All other property he gave to the three daughters. The document also contains the following: ''I desire to make this statement, that I have not given my son D. A. Culberson any property under this will for the reason that I have heretofore given him 280 acres of land which in my judgment will make him equal with the others. And it has been my purpose to make my children equal''.

The first codicil dated July 18, 1936, after referring to the fact that the daughter, Willie B. Reece had died since the original will was executed provides that the one-third interest given to her should go to the other two daughters, Mrs. Mary Cude and Mrs. Maud Cude, share and share alike.

Insofar as is material, the second codicil dated May 8, 1945, after referring to the fact that the farm given to the wife for life with remainder to the daughters had been sold, provides that in lieu thereof the widow should have ''my present home place of about 345½ acres for life, with remainder over at my death to my daughters,

Mrs. Maud E. Cude and Mary Cude, in equal shares or moities".

The contest arose from the fact that the will made no provision for the son, Alex. Culberson, and the grandson, William Edward Reece.

■ The proponents have assigned 31 errors. The first question to be dealt with is whether their motion for a directed verdict sustaining the will should have been granted. This depends upon whether, considered in the light most favorable to the contestants the evidence was sufficient to support the verdict. The Nature and extent of the discussion in the brief as to what the law required in this connection calls for a response somewhat more detailed than is usual in this connection.

■ Although it is commonly referred to as a will contest, the trial of an issue of devisavit vel non in the circuit court is an original proceeding to probate a will. Jones v. Witherspoon, 182 Tenn. 498, 187 S. W. (2d) 788. In that case Mr. Justice Gailor, for the Court, demonstrates that the form of action is sui generis, strictly in rem, and derived not from the common law but from the ecclesiastical courts of England. And in Hager v. Hager, 13 Tenn. App. 23, 27 (certiorari denied by the Supreme Court), it is said: "Will contests at the hands of juries were unknown to the common law and in a great many states these controversies are tried by the court". See also, Page on Wills, Vol. 2, 214, sec. 643; 31 Am. Jur. 565; 28 R. C. L. 404; Note 62 A. L. R. 78. But whether by reason of the fact that they were not so triable at common law, such cases are excluded from the constitutional guaranty of trial by jury and thus from the restrictions thereby imposed upon the power of the judge with respect to disputed issues of fact (Hunt v. Hunt,

169 Tenn. 1, 80 S. W. (2d) 666), it is not within our province to decide and it would be unnecessary to do so in any event. This, because such a trial is provided for by Code, Section 8107, and we apprehend that under that statutory provision the authority of the trial judge or the appellate court to direct a verdict is the same as it is in those cases within the purview of the constitutional provision.

■■ This rule is that there can be no exercise of the power to direct a verdict in any case where there is a dispute as to any material evidence, or any legal doubt as to the conclusion to be drawn from the whole evidence, upon the issue to be tried. Tyrus v. Kansas City, Ft. S. & M. R. Co., 114 Tenn. 579, 86 S. W. 1074. Elucidating this statement, the court, in Brenizer v. Nashville, C. & St. L. Ry., 156 Tenn. 479, 484, 3 S. W. (2d) 1053, 1054, 8 S. W. (2d) 1099, said: "This is sometimes called the 'scintilla rule,' but perhaps inaccurately. More than a 'scintilla' is requisite. As well said in Louisville & N. R. Co. v. Johnson, 161 Ky. 824, 171 S. W. 847: 'The word "scintilla," however, as applied in our practice, does not mean that the case should be submitted to the jury when there is merely a "spark" or "glimmer" of evidence.' It means that, when there is some evidence of a material or substantial nature to support the plaintiff's case, the court will not undertake to determine its comparative value or weight, but will leave the determination of the conflict to the jury". See Tenn. Cartage Co. v. Pharr, 184 Tenn. 414, 199 S. W. (2d) 119.

■ "By material evidence", says our Supreme Court, "is meant evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with

the other evidence, be determinative of the case''. Knoxville Traction Co. v. Brown, 115 Tenn. 323, 331, 89 S. W. 319, 321. A conflict ''upon a detached or separate feature or fact'', it continues, ''even though it is material, should not of itself prevent the giving of peremptory instructions. Facts are frequently material which are by no means determinative; and facts are frequently material in themselves, but become immaterial when taken in connection with other facts.'' Ibid.

By ''substantial evidence'' is meant ''such relevant evidence as a reasonable mind might accept as adequate to support a conclusion''. Consolidated Edison Co. v. National Labor Relations Board, 305 U. S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126, 127, 140, per Chief Justice Hughes; Tenn. Cartage Co. v. Pharr, 184 Tenn. 414, 199 S. W. (2d) 119; see also, Fitch v. Am. Trust Co., 4 Tenn. App. 87, 94; Farmers Union Bank v. Johnson, 27 Tenn. App. 342, 355, 181 S. W. (2d) 369.

With respect to relevancy, Dean Wigmore in his classic treatise on evidence, says that the general and broad requirement is ''that the claimed hypothesis from the offered fact must be a probable or more probable hypothesis with reference to the possibility of other hypotheses.'' Wigmore on Ev., 2d Ed., vol. 1, sec. 38.

In this connection it must be borne in mind that testimony is not necessarily evidence within the meaning of the rule we are considering. Evidence inherently lacking in relevancy or probative quality acquires no new virtue merely because it is introduced. Jones v. Tenn. Cent. Ry. Co., 8 Tenn. App. 183, 193; 32 C. J. S., Evidence, Sec. 1034.

With the tacit approval of our Supreme Court, this Court has said: ''The mere dogmatic assertion which

does not appeal to the reason of the court, which does not have substantial and relevant consequence, which does not have fitness to induce conviction, is not proof even if uncontradicted, and does not interfere with the duty of the court to direct a verdict". Fitch v. American Trust Co., 4 Tenn. App. 87, 94, per DeWitt Judge.

But to warrant rejection under this rule the evidence must be either inherently self-contradictory, or irreconcilable with facts of which the court takes judicial knowledge, or inconsistent with undisputed physical facts or laws. Southern R. Co. v. Hutson, 170 Tenn. 5, 7, 91 S. W. (2d) 290; Duling v. Burnett, 22 Tenn. App. 522, 530, 124 S. W. (2d) 294.

Testimony cannot be rejected merely because the fact it tends to show is highly improbable. Mack v. Const. Co., 10 Tenn. App. 402, 403, 411.

Whether, under these rules testimony rises to the dignity of evidence is a question of law for the court. Thus, in the well-reasoned case of Thoe v. Chicago, M. & St. P. R. Co., 181 Wis. 456, 195 N. W. 407, 408, 29 A. L. R. 1280, it is said: "The plaintiff in an action is not entitled to recover, merely because he introduces testimony or evidence upon the trial. In order to entitle him to recover, he must introduce evidence which is legally sufficient to sustain a verdict, and warrant a judgment in his behalf. In other words, he must produce evidence, which, if accepted as true, is sufficient in law to sustain a recovery. Evidence offered upon a trial has two aspects, or, as is sometimes said, a twofold sufficiency—a sufficiency in law and a sufficiency in fact. From time immemorial, in the common-law courts of this country and in England, it has been the duty and province of the court to determine the

legal sufficiency of the evidence.'' See Wigmore on Evidence, 2d Ed., vol. 1, secs. 29 and 30; ibid, sec. 475-478.

The principle is recognized by Wigmore: ''The sufficiency of the evidence to go to the jury'', says he, '' (the significance of which is that the proponent is no longer liable to a nonsuit or to the direction of the verdict for the opponent) is also often referred to as a 'prima facie' case. In this sense, the phrase is used to emphasize the insufficiency of evidence which is indeed admissible, so far as the various rules of evidence might have excluded it, but yet, being all the evidence offered by the proponent, is not enough in quantity to be worth submitting to the jury''. Wigmore on Evidence, 2d Ed., vol. 5, sec. 2494, pp. 455, 456; see also, vol. 5, sec. 2487; vol. 1, secs. 28 and 29.

Our cases have expressly recognized the distinction pointed out by the Wisconsin court in Thoe v. Chicago M. & St. P. R. Co., supra. In Powers v. McKenzie, 90 Tenn. 167, 16 S. W. 559, 561, where the acts of 1889, ch. 22, Code, Sec. 9731 providing for the comparison of a disputed writing or signature with any writing or signature proved to the satisfaction of the court to be genuine, was attacked as an invasion of the province of the jury contrary to the Constitution, the court said: ''It is a legislative adaptation to the subject-matter of the settled rule of the common law, that, as a general proposition, it is the province of the court to say what is evidence in cases, and the province of the jury to decide upon its efficacy.''

This view was re-affirmed in the recent case of Omohundro v. State, 172 Tenn. 48, 109 S. W. (2d) 1159, wherein there will be found several instances gleaned from the cases holding that the court must determine

as a preliminary question whether the evidence is sufficient in law to warrant its being considered by the jury.

In short, the law fixes a standard by which the court is to determine whether evidence, assuming it to be true, is sufficient to warrant a rational conclusion. Whether the evidence meets the test is a question of law and, of course, does not involve the credibility of the witnesses, which is always a question for the jury. If it does meet the test and if there be evidence opposed thereto of the required character, then it is for the jury to determine the preponderance of the probabilities and in so doing it is exclusively their function to resolve all conflicts and determine the credibility of the witnesses and the weight to be given their testimony. Bryan v. Aetna Life Ins. Co., 174 Tenn. 602, 130 S. W. (2d) 85; Ballinger v. Connecticut Mutual Life Ins. Co., 167 Tenn. 367, 69 S. W. (2d) 1090; Southern R. Co. v. Hutson, 170 Tenn. 5, 91 S. W. (2d) 290. So, also, if from evidence meeting the prescribed test and assumed to be true, reasonable minds could draw different conclusions, the jury must decide that question. Western Union Tel. Co. v. Lamb, 140 Tenn. 107, 111, 203 S. W. 752; Conaway v. New York Life Ins. Co., 171 Tenn. 290, 294, 102 S. W. (2d) 66; Tenn. Jellico Coal Co. v. Young, 18 Tenn. App. 537, 79 S. W. (2d) 815.

However, in determining whether a motion for peremptory instructions should be granted, the court must take into consideration evidence introduced by the movant supporting his contentions, insofar as it is not in conflict with the evidence of his opponent. Nashville, C. & St. L. Ry. v. Sutton, 21 Tenn. App. 31, 104 S. W. (2d) 834, and cases cited. Moreover, it has been well said that "the evidence produced by one party must be

considered in connection with the evidence produced by the other parties. Evidence which unexplained might be conclusive may lose all probative force when supplemented and explained by other testimony". Stork Restaurant Co. v. Boland, 282 N. Y. 256, 26 N. E. (2d) 247, 255. This expression of the New York Court of Appeals, we think in accord with our own cases on the subject. Knoxville Traction Co. v. Brown, supra. But evidence that is contradicted by or inconsistent with that favorable to the party opposing the motion for a directed verdict must be disregarded in determining whether the motion therefor should be granted. Nashville, C. & St. L. Ry. v. Sutton, supra; Martin v. Electric Co., 9 Tenn. App. 542, 558; Nashville Gas & Heating Co. v. Phillips, 17 Tenn. App. 648, 651, 69 S. W. (2d) 914.

█ It follows therefore that in determining whether an issue of legal cognizance not controlled by the rationale of Hunt v. Hunt, 169 Tenn. 1, 80 S. W. (2d) 666, should be submitted to the jury, the ultimate question always is, does the evidence regarded in the most favorable light furnish a rational basis for a verdict? Cf. Tenn. Cartage Co. v. Pharr, supra.

█ █ Guided by these rules, we proceed to a determination of whether there is the requisite support for a verdict against the will on the issue of mental incapacity. The mental condition of the testator at the very time the will was executed is the question in issue, but in ascertaining this condition at that time, evidence of his mental and physical condition before and after making the will is received within reasonable limitations. His appearance, conduct, conversation and declarations, together with any well marked change of character or habits without sufficient cause, and any other particular

fact or facts from which the condition of the testator's mind at the time in question may be inferred, are competent on the issue of testamentary capacity. Bridges v. Agee, 15 Tenn. App. 351, 355, 356; Sizer's Pritchard, Sec. 111; Note 68 A. L. R. 1311, 1315.

There was much evidence with respect to the harsh and penurious treatment by the testator of his son and two Negroes whom he employed in his farming operations. And it may be conceded that the evidence showed the testator to have been a callous and rather ruthless individual, who was dominated by an inordinate desire to accumulate money, and that in the pursuit of this ambition he drove those in his employ and his son with little if any regard to humane considerations. As one witness for the contestants expressed it, "the financial world was where his mind was, regardless of humanity— his mind and conversation run in dollars and cents—instead of humanity".

In his argument before this court, able counsel for the contestants accurately summed up this feature of the case in substantially this language: "The testator's outlook on life and his attitude toward his fellow man including his own son were medieval". We think this just about expresses the most that evidence showed on this subject and it would serve no useful purpose to detail it, for we are unable to perceive how the characteristics shown, however lamentable when judged by conventional standards, have any bearing on the issue in hand. It is sufficient to say that from his youth until about 1927 the testator's son, Alex., was required to work long hours on the testator's farm along with the Negroes. He received no pay for his services and was allowed little if any social life. But on January 12, 1927, his

father gave him a farm, containing some 280 acres, delivering to him a deed therefor which recited that the consideration was love and affection. Alex. later moved to this place from his father's home and operated it for himself. However, he testified that he was later required to pay for the property and did so without objection. The circumstances of this transaction are hereinafter referred to in connection with the discussion of the other issue.

For many years prior to his death, the testator suffered from stomach trouble. He vomited after almost every meal and was at times in much distress. In his later years he used sedatives and bromides to ease his discomfort and enable him to sleep. In 1938 he broke his hip and was confined for several months, first in a hospital and later in his home. The immediate cause of his death in February 1946 was cancer of the stomach which apparently developed from the ailment which had existed over a long period.

The original will and the first codicil were drawn by Mr. J. L. Fry, and the last codicil by Mr. W. M. Miles. Both are prominent members of the bar of Union City, and were the testator's personal friends of long standing. Both testified as to the circumstances under which the respective documents were drawn and both gave an unqualified opinion that the testator was of sound mind. In addition to these witnesses, some thirty others expressed the same opinion. They were all disinterested and included bankers, business men, farmers and three doctors, all of whom were personally acquainted with the testator and had had dealings with him affording them an opportunity to form an opinion.

But under the applicable rule for determining the property of a motion for a directed verdict, the opinions of these witnesses must be disregarded and only the evidence favorable to the contestants considered. This consisted solely of opinions expressed by some ten lay witnesses. The question is whether these opinions have any probative value; whether they rise to the dignity of evidence. This turns upon whether the facts detailed justified the opinions expressed. Fitch v. American Trust Co., 4 Tenn. App. 87, 94; Sizer's Pritchard, Sec. 110. There seems to us no doubt that the answer to the question posed must be in the negative. In support of their contention that the opinions were warranted, the contestants lump together all of the circumstances detailed by all of the witnesses. Manifestly this composition affords no accurate test of the validity of the respective conclusions expressed by the several witnesses. Upon the contrary, the opinion of each must stand or fall upon the facts and circumstances detailed by him.

It would serve no useful purpose to detail the circumstances related by all of these witnesses as forming the basis of their respective opinions. In every instance which by the very widest latitude can be said to be worthy of notice, the witness admitted that where a question of money or property was involved the testator comprehended what he was doing and was fully capable of taking care of his own interests. For instance the son Alex. who testified in the greatest detail, and dealt with his father in business transactions both before the execution of the will and afterward, testified on cross-examination that his father knew how to make money and save it; that he executed contracts, deeds and other instruments; that he loaned money on mortgages; that

in 1940 he bought a 345-acre farm and in doing so made the best trade of his career; that he operated this farm successfully until his death and prior to that purchase had successfully managed one of 220 acres, and that "nobody hardly ever beat him in a trade."

Mrs. Alex. Culberson, on cross-examination made similar admissions. She testified, among other things, that the testator fully understood what property he had and how he had disposed of it by his will; that he understood that he had pretermitted his grandchild and explained to her why he had done so.

John Culberson, a brother, testified that he thought the testator of unsound mind, basing his opinion largely on the fact that he had "willed the two children (son and grandson) out". On cross-examination he said that the testator had sense enough to make money and keep it; that he looked after his business well and was a close trader; understood the business of farming and was good at it; that he did not claim the testator was crazy but just peculiar.

Mrs. John Culberson, on cross-examination, testified that she regarded the testator as an honest man, keen about business and that he understood his property.

The evidence of the other witnesses who testified on this subject was so far lacking in support as not to be worthy of notice.

Without implying that the circumstances narrated by those above referred to were sufficient to support the opinions expressed, it is enough to say that the admissions above detailed destroyed any probative force their opinions might otherwise have had, if any. Fitch v. American Trust Co., 4 Tenn. App. 87.

To say that a man who successfully transacted business on the scale which the testator is conceded to have done and with the acumen it is admitted he displayed, did not have the mental capacity to make a will, is so far lacking in an appeal to reason that it cannot be regarded as evidence at all. Upon the contrary, the undisputed evidence we think left no doubt that the testator knew and understood exactly what he was doing when he made the original will and also when he made the two codicils. He knew the object of his affection and fully appreciated the effect of the disposition he made of his property. No more was required insofar as mental capacity was concerned. Farmers Union Bank v. Johnson, 27 Tenn. App. 342, 181 S. W. (2d) 369; Melody v. Hamlin, 21 Tenn. App. 687, 115 S. W. (2d) 237; Bridges v. Agee, 15 Tenn. App. 351. It follows that the verdict regarded as referable to that issue cannot be sustained.

It remains to be determined whether there was a rational basis in the evidence for the conclusion that the will was the result of undue influence. It is apparent that this is the ground principally relied upon to sustain the verdict, and it presents a more complicated question both as to the law and the facts. The contention is that as a result of undue influence exercised by the widow, Sudie Culberson, and the two daughters, Mary and Maud Cude, aided to some extent by the latter's husband; the son Alex. and the minor grandson William Edward Reece were pretermitted by the testator in making his will.

Having regard to the rule that the view most favorable to the contestants must be taken, the following version of the facts stands either undisputed or supported by some material and substantial evidence. In the Christmas

holidays, 1929, Alex. married, greatly to the displeasure of his father. He testified that his father would first cry about it and then get mad. The contestants' explanation of the father's opposition to the son's marital venture seems to be that he did not want to lose Alex.'s services which he had been receiving at a minimum outlay.

As already said, notwithstanding his harsh and penurious treatment of his son Alex., the testator in 1927 gave him a 277 acre farm. According to the testimony of Alex. and his wife, the testator on January 6, 1930, one month and a few days before the will was originally executed and published, retracted the gift and demanded that Alex. pay him $6,000.00 for the farm, assigning as a reason, (according to Alex.), that "he had married and left him and quit working for him, and (that) my mother and sisters and brothers-in-law were objecting to my leaving and quitting work for him and now he felt like I ought to pay him $6,000.00 for the place.". Alex. also testified that he made no objection to this proposal, and in fact had none; that upon the contrary he told his father that he would re-convey the farm to him if it would help him in any way; that the father did not want the farm, but wanted money therefor instead, which, Alex. did not then have; that he told his father of his financial condition and offered to sign a note for the amount demanded, which was agreeable and was accordingly done, his wife being required to sign also. He also testified that he discharged the obligation of this note in full by making payments over the period from January 6, 1931, to March 12, 1937, the total aggregating $7,630.00. The contestants offered in evidence a note corresponding to that described and purporting to reflect

on the back thereof a record of the several payments. These range in amount from $770.00 to $1,360.00. Alex. testified that notwithstanding that at that time he had a checking account in a bank, all the payments were made in cash; that each credit was put on the note by him as the payment was made and that this was done at his father's request.

The proponents vigorously attacked the note as a sham and a fraud, concocted to overcome the statement in the will, dated a month and a few days after the alleged note was executed, to the effect that the testator had given Alex. 280 acres of land and for that reason was making no provision for him in the will. They showed that none of the payments were reflected by the testator's bank account; that no member of the family had ever heard of the transaction or of the existence of the note, and in addition to evidence of other circumstances casting a strong suspicion on the alleged transaction, they offered expert evidence that the alleged credits on the note were all made at the same time and place and with the same pencil.

If the bona fides of this transaction was relevant and material in the determinative sense, we would be obliged to accept the contestant's version of it, because any conflict would have to be regarded as having been settled by the jury. But we think that this was a detached and collateral issue of doubtful relevancy that was not determinative, and hence the conflict in the evidence with respect thereto would not alone be sufficient to take the case to the jury.

In February, 1930, Alex. and his wife went to the father's home intending to spend the weekend. Upon their arrival, Alex. took his team to the barn to feed

them. The three daughters and the son-in-law, Chappel Cude, were in the house, and when Alex.'s wife entered alone, some one or more of them urged the testator to go out to the barn and see what Alex. was doing. He did so, and found Alex. feeding corn to his tean. The testator objected and in effect accused Alex. of stealing his corn. A quarrel ensued, the testator becoming greatly enraged, telling Alex. to leave and not come back. Alex. and his wife thereupon took their departure. The result of the incident was an estrangement, during which the testator according to Willis Reece, father of the minor contestant, "carried a pistol for his son."

A reconciliation took place about Christmas, 1930, and thereafter the relations between all of the members of both families continued cordial until the father's death in 1946. Alex. and his wife regularly attended the family gatherings periodically held in the father's home, and Alex. himself was called upon by his father for advice and assistance whenever there was occasion therefor. In fact, so far as appears he was in as much favor with his father as was any other member of the family.

The testator's daughter, Willie B. Reece, mother of the minor contestant, William Edward Reece, died a few days after the birth of her child as a result of a condition brought about by that ordeal. Within a short time thereafter the testator sought to have the father turn the child over to him and his family to rear. He seemed anxious that this be done and was supported in this desire by his wife and daughters. The child's father, Willis Reece, testified that "they were all wondering what I was going to do with the baby and of course I could see the handwriting on the wall. Mr. Culberson said he would like to have him. I told him I wouldn't

part with my child with (sic) nobody—I was going to see after him and keep (him), and would give him to no one.''

In fact, the child was turned over to Mrs. Ed Reece, the mother of Willis Reece, who appears to have lived in Union City some distance from the Troy neighborhood in which the testator's family lived. Reece married again in September, 1936. Presumably he and the stepmother took over custody of his son, but just when is not clear.

The failure of the testator to get custody of the child resulted in strained relations between the members of the two families. This feeling was augmented by a rumor, presently to be further noticed, to the effect that Willis Reece had poisoned his deceased wife. On one occasion testator's daughters went to the home of Mrs. Ed Reece to see the child. There is a conflict as to whether their mother, Mrs. Sudie Culberson, accompanied them. This visit was made shortly after the child's mother died. Upon their return the daughters reported that the baby was being neglected. At another time the testator, when passing, stopped in to see the child. So far as appears neither the daughters or the testator ever saw the boy again, except perhaps in passing on the streets of Union City. However, the testator's wife requested the father, Willis Reece, to bring the child to see her and the testator. Reece testified to this effect and said that he refused to do so ''because he was too young for me to carry and if my mother wasn't wanted I couldn't go''. He did not say why his mother was not welcome in the Culberson home. The only possible explanation is the feeling resulting from the facts above stated.

Mrs. Ed Reece testified that when the testator's daughter came to see the child on the one occasion above mentioned, they "invited us to come see them"; that "we intended to go but after the rumor got out they seemed to get huffed and I didn't think I was wanted." However, both she and her son testified that the testator and his family were welcome to see the child at any time but never again availed themselves of the opportunity.

The result was that from the death of his daughter in April, 1936, until his death in February, 1946, the testator saw his grandchild only on the one occasion when he stopped in the Ed Reece home as he was passing.

The crux of the case upon the issue of undue influence lies, we think, in the extent to which the declarations of the testator are available to the contestants as proof upon or in connection with that issue. Some of the declarations relied upon refer to the son, Alex., and other to the minor grandson, William E. Reece. For present purposes these may be condensed and summarized as follows: (1) that in July, 1936, before the first codicil was made, the testator said that "on account of his wife, his two daughters and their husbands, he would be compelled to leave the grandchild, William E. Reece, out of his will"; (2) that in August, 1936, after the execution of the first codicil he said that he had pretermitted the grandchild because "his wife, two daughters and their husbands were aggravating him so about it that he could not sleep at night," and that but for their importunities he would not have done so; (3) that in the fall of 1938 he said that he was going to destroy his will; (4) that in 1940 he said "he had his will made wrong and was going to change it but wanted to wait as long as he could to keep from having an argument and fusses with the

▮▮▮▮▮▮▮▮▮▮▮

women folks''; (5) that in 1940 and 1941 he said that he "had left his own son, Alex., out of his will but he was going to put him back in it.''

We do not stop to deal with whether some one or more of these declarations were incompetent for any purpose, as for remoteness, lack of relevancy or other reasons. See Wigmore on Evidence, 2d Ed., vol. 3, sec. 1734.

In that text, it is emphasized that in examining the propriety of allowing the use of declarations, it is essential to keep separately in mind "(a) what is the fact which the utterance is offered to evidence, (b) whether this fact is relevant, and in what way, and (c) supposing it to be relevant, whether the utterance is admissible to evidence it". Ibid.

▮▮▮ For present purposes it is necessary to determine only how far those offered are available as evidence to support the verdict on the issue of undue influence. The author of the text just cited properly observes that the utterances of a testator to the effect that a particular will was procured by fraud or undue influence, or that certain persons have been or are the object of his affection or dislike are subject to consideration in several aspects. "The chief ·distinction", he says, "is between their use as direct *assertion of the external fact of fraud or undue influence*—for here they are met immediately by the Hearsay Rule—and their use as indicating (directly or indirectly) a condition of mind relevant to the issue—for here they are admissible either as circumstantial evidence or as statements of a mental condition under the present Exception" (to the Hearsay Rule). Wigmore on Evidence, 2d Ed., vol. 3, sec. 1738.

In this connection, it is pointed out that "the existence of undue influence or deception involves incidentally a consideration of the testator's incapacity to resist pressure and his susceptibility to deceit", and that "futhermore, the normality of the will's dispositions, with reference to the natural and uninfluenced desires of the testator must be investigated". For these purposes the use of the testator's declarations is said to be universally sanctioned. Ibid.

Mr. Wigmore's views were approved in Hobson v. Moorman, 115 Tenn. 73, 90 S. W. 152, 3 L. R. A., N. S., 749, 5 Ann. Cas. 601, wherein all the cases in this state up to that time and many others are exhaustively reviewed

The subject is ably and elaborately treated in a note appearing in 79 A. L. R. 1447 et seq. Upon a review of the cases, the learned editor demonstrates that the rule adopted by the overwhelming weight of authority is as stated by him: (That) "declarations of the testator not made contemporaneously with the execution of the will, or so near thereto as to constitute a part of the res gestae, are not competent as direct or substantive evidence of the truth of the matters therein stated, when offered on the issue of undue influence inducing the execution of the will. If offered as direct or substantive evidence of an external fact, such as undue influence or fraud, statements of a testator are merely hearsay, and are liable to all the objections to which mere declarations of third parties are subject." Ibid. loc. cit. p. 1449.

It is shown by the author that except perhaps in a few jurisdictions the rule applies to declarations whether made before or after the execution of the will; and moreover that it is inaccurate to say, as is sometimes done,

that such declarations are admissible as corroborative evidence of undue influence; that upon the contrary they have not the least force as evidence of the fact of such influence; and where competent at all can be considered only to show the susceptibility of a testator's mind to undue influence and the effect thereof. Loc. cit. pp. 1453, 1454, 1458; see also, Page on Wills, Vol. 2, p. 673.

Our cases are clearly in accord with the majority rule. In Hobson v. Moorman, supra, it was conceded on the brief that declarations made subsequent to the will are not competent as substantive evidence of undue influence, but it was contended that a distinction should be made in favor of prior declarations. Upon full consideration the court rejected this contention and held that antecedent declarations may be used to illustrate mental capacity and susceptibility to extraneous influence and also show the feelings, intentions and relations of the testator to his kindred, but not as substantive evidence of undue influence. See also Ricketts v. Ricketts, 151 Tenn. 525, 267 S. W. 597; Hickey v. Beeler, 180 Tenn. 31, 171 S. W. (2d) 277.

In Hager v. Hager, 13 Tenn. App. 23, 32, this court (Middle Section), after pointing out that ''at no time can the declaration of a testator be affirmative or competent evidence tending to show the fact of undue influence'', summed up as follows: ''An approved statement would be and is that if there be other circumstances indicating or tending to prove the fact of undue influence, that is, the substitution of another's will for that of the testator, then the *extent* of that influence *independently* shown may be revealed by proving the declarations of the victim of that undue influence.'' (Emphasis ours.)

It is apparent therefore that the declarations above set out cannot be used to support the verdict in the present case with respect to the fact of undue influence, regardless of whether some one or more of them may have been inadmissible altogether.

■ Hence, it remains to be determined whether there is other relevant evidence of a material and substantial nature tending to show the fact of undue influence directed at the testamentary act. Evidence of mere influence will not suffice. To suffice, it must be undue influence. This means such as deprives the testator of his free agency and discretion, a moral force amounting to coercion which the testator in a spirit of submission has no power to resist. Nailing v. Nailing, 34 Tenn. 630, 635; Johnson v. Chadwell, 27 Tenn. 145; Wisener v. Maupin, 61 Tenn. 342.

■ The contention that the verdict has the requisite support is of a dual aspect; one directed at the pretermission of the son Alex., and the other at the pretermission of the grandson, William E. Reece. As to the first, apart from the declarations of the testator, the evidence apparently relied upon consists solely of the testimony of Willis Reece, father of the minor contestant. This was extremely general in nature. It was to the effect that on several occasions the witness heard the three daughters (one of whom was his then wife), the other sons-in-law, Jimmy and Chappel Cude, and the testator's wife (he lumped them all together), say, ''Pappy, you ought to will him (Alex.) out. He has more than is due him''. When asked concerning the time when such statements were made, the best the witness could do was to say, ''Approximately 1930''; and that he heard them both before and after the quarrel between Alex. and his

father in February of that year. As said, he gave no details but contended himself with the general statement; nor did he undertake to say whether the testator responded to these pleas of his family or how he reacted thereto.

The statement that Alex. had already received more than was his due presumably referred to the gift of the 277-acre farm in 1927 which Alex. testified was retracted in January, 1930. There is no evidence that any member of the family wanted Alex. left out entirely, but only on the assumption that he had already received his part of the estate. It would seem therefore that the importunities of the family could have been readily answered by the mere statement that the gift had been rescinded and Alex. required to pay for the farm, but as already said, no member of the family ever heard of that alleged transaction until after the testator's death and the present controversy arose.

But wholly apart from this, the pleas of the family testified to by Reece were intrinsically inadequate to support the conclusion that by reason thereof the testator was unduly influenced within the meaning of the rule above stated. Solari v. Albertine, Tenn. App., 193 S. W. (2d) 111, 118. In that case, Judge Baptist for the Court, upon reason and authority, points out that a person has a right by fair argument or persuasion to induce another to make a will and even to make it in his own favor; that appeals to affection, attachment and sense of duty and obligation accompanied by honest intercession and persuasion will not, in the absence of fraud and deceit, suffice to overthrow the will of a mentally competent testator, and the will of such an one cannot be overturned by proof that the beneficiary subjected him to irritating and persistent importunities where it appears

that the will was drawn up from the testator's dictation in the absence of the beneficiary and executed by him in the presence only of the scrivener and the witnesses selected by the testator.

▮▮▮ The evidence relied upon as showing that the pretermission of the grandson was the result of undue influence relates to certain accusations made by members of the testator's family with respect to the death of the child's mother. The child was born in a hospital in Union City where the mother had been taken shortly before. The mother died a few days afterwards. This was in April, 1936. The cause of her death was diagnosed by the attending physician as uremic poisoning accompanying childbirth. Shortly thereafter her husband, Willis Reece, began courting the nurse who had attended his wife in her last illness. This courtship resulted in a marriage ceremony which took place in September, 1936. The fact that Reece began showing interest in the nurse so soon after his wife's death displeased the members of the wife's family, and upon one occasion her mother, the testator's wife, remonstrated with Reece about it.

The rumor to the effect that Reece poisoned his wife was utterly baseless. There is no contention to the contrary. It appears to have started, not with any member of the testator's family, but in Union City, just how or by whom, no one seemed to know. It may have been due to some ignorant person's attaching an unwarranted significance to the diagnosis of uremic poisoning, considered in connection with the fact that the surviving husband began courting the attending nurse so soon after the wife's death. But this is pure speculation.

In any event, the rumor reached the ears of the testator and his family, and the only competent evidence

relied upon as showing undue influence in the making of the codicil to the testator's will consists of representations and entreaties based on this report and alleged to have been made to the testator by his wife, his two daughters and their husbands.

The witnesses testifying upon this point were in the main Alex. Culberson and his wife. Their testimony was general in nature and in substantially the same language. The form and substance of that of the wife was that shortly after the death of the testator's daughter in April, 1936, she heard the testator's wife, his two daughters and one of their husbands, (she also lumped them all together), say to the testator, ''Papa, you don't want the Reeces to have anything you got and you know that he certainly did poison her and you want to make your will out so they will not get anything you have got.'' She further testified that statements of this kind by the same parties ''continued on for several months.''

As said, the contestant Alex.' testimony was substantially to the same effect, and apparently related to the same occasions. But he added that on each occasion the testator said that he did not believe the report that Reece had poisoned his wife. Several other witnesses for contestants quoted the testator to the same effect. In fact, it appeared that whenever the subject was mentioned he reiterated his disbelief.

Thus, Willis Reece, the minor contestant's father, testified that he had been in the testator's home but once since his, Reece's wife died; that this was about a month after her demise. He said that on this occasion he discussed with the testator the cause of his wife's death and told him that he would give $500.00 to anyone who could prove that he poisoned her; that the testator replied: ''I

don't believe you done it and I never will. But my folks talk about it and I can't help it''. Reece continued that at that time, ''The scandal was all over town'' (Union City), and that to refute it was the reason for his visit.

The accusations against Reece are treated as constituting undue influence. We think, strictly speaking, that they partake more of fraud. While the two grounds of attack are closely related, fraud has many aspects clearly distinguishable from undue influence. Thus, for the attack to be successful on the latter ground it must be shown that the free agency of the testator was destroyed to the extent that the will though nominally his was in reality that of another; whereas in a case of fraud the free agency remains but is misled into doing that which it otherwise would not have done. Again, it is obvious that mental capacity may be a much less important factor in a case of fraud than in one of undue influence. See notes, 28 A. L. R. 787, 791; 92 A. L. R. 790, 793.

It is recognized however that undue influence may be grounded on false and fraudulent representations made to the testator and insofar as the present case is concerned, the distinction between the two grounds of attack is of no practical importance. The rule to be applied is stated in an authoritative text as follows: ''It is essential . . . in order to avoid a will for undue influence of this nature that the statements be false; that the testator be unable, through weakness of mind and body, or concealment of the facts, to determine the falsity of the statements and resist the influence; and that he rely and act on them rather than on other motives and inducements.'' 68 C. J. 751.

If it be shown that the testator knew of the falsity of the representations upon which the claim of un-

due influence is grounded, and that he did not rely thereon, the attack fails. To show such knowledge on the part of the testator, his declarations are competent evidence. Van Raalte v. Graff, 299 Mo. 513, 253 S. W. 220; Estate of Carson, 184 Cal. 437, 194 P. 5, 17 A. L. R. 239; Page on Wills, Vol. 2, pages 716, 717.

It is therefore clear that the accusations against Reece were insufficient to make a case of either fraud or undue influence. The charges being directed, not against the pretermitted grandchild but against his father, who was not an object of the testator's bounty, a good argument could be made that they were too remote in point of causation, nothing else appearing, to furnish a basis for a reasonable conclusion that they operated as an effective influence in the execution of the codicil which denied the grandchild participation in the estate. However, it is not necessary to rest a decision on that ground, for there is another which is conclusive. Not only was there no relevant evidence that the testator was unable to determine the truth, but it indisputably appeared that he did ascertain that the rumor or report was baseless and accordingly was not convinced by the accusations. There was therefore no basis for the conclusion that he relied upon them in executing the first codicil.

In addition to the foregoing reasons, there is, we think, another reason equally decisive against the verdict. This is, that by the execution of the second codicil there was a republication of the original will and the first codicil under circumstances which preclude the view that in performing that testamentary act the deceased was not a free agent exercising his own discretion and not that of another.

As said, that codicil was prepared by Mr. W. M. Miles, the testator's personal friend of long standing. He and his brother, Mr. C. W. Miles, president of a bank in Union City, were accustomed to visit the testator at more or less frequent intervals. At the testator's request the two brothers on May 8, 1945, journeyed to the testator's home in Troy, and were informed that he desired to consult Mr. W. M. Miles about his will. That document was then in the bank at Troy, where it had been since it was first executed except upon the occasion when it was carried to Mr. Fry's office in Union City in order that the first codicil might be drawn. Upon the arrival of the Messers. Miles, the testator had some one call Mr. Berry, the cashier of the bank at Troy, and request that he bring the will to the testator's home. When Mr. Berry arrived with the document, the members of the testator's family retired from the room and not one of them was present during the ensuing discussion and ceremony. The testator requested Mr. W. M. Miles to look over the will which Mr. Miles did, calling attention to the fact that the place which had been given to the testator's wife had been sold and therefore would not pass under the will as it then stood. Whereupon the testator said that he wanted the place where he was then living to be substituted with the remainder over to his two daughters, and that he also wanted to make a change in the executorship by naming his wife to that trust in the place of the party named in the original document.

Mr. Miles also called attention to an erroneous reference in the first codicil to the date of the original will and suggested that it be corrected. This was agreed to. Thereupon, Mr. Miles prepared the codicil exactly as directed by the testator. It was then read over to him,

fully understood and signed in the presence of Mr. Miles and his brother, Mr. C. W. Miles and Mr. Berry, the latter two being the subscribing witnesses. The will was then turned over to Mr. Berry, who carried it back to the bank and there deposited it for safe-keeping. So far as appears it remained at the bank until it was produced for probate.

In addition to the foregoing facts, which are not disputed, Mr. Miles testified as follows: "Before Otis Berry came or after he left, I think it was before he arrived, he (testator) asked me if he had to give his grandchild anything. I explained to him that under the law he did not. Many people thought you had to leave a child as much as a dollar or $5.00—that that was not the case, that he had a right to dispose of his property as he wanted; that as he was leaving, the testator told him that 'if anybody tries to do away with (the will) or break it I want you to look after it or defend it—(and) I want you to get Mr. Edgar Hudgins to help you'; that I told him that I would be glad to and I came back and communicated that fact to Mr. Hudgins, as he can verify."

The general rule is that where a mentally competent testator has ample opportunity to revoke his will subsequent to the operation of an alleged undue influence upon him but makes no change in it, the effect of the evidence of the vitiating influence is regarded as having been destroyed. Peery v. Peery, 94 Tenn. 328, 343, 29 S. W. 1, 28 R. C. L. 151. In the case cited it was shown that the testator some time after making his will (just how long is not stated), spoke of its provisions to one of the subscribing witnesses, expressing satisfaction with its contents, and explaining why he made an apparently unequal division of his property. He had then had ample

time and opportunity to have revoked it as it was in the custody of the draftsman and not of his wife who was charged with having exercised the undue influence. It was held that this was a strong and convincing indication that it was his will and according to his desires, citing Floyd v. Floyd, 3 Strob., S. C., 44, 49 Am. Dec. 626; and Irish v. Smith, 8 Serg. & R., Pa., 573, 11 Am. Dec. 648; see also, Earp v. Edgington, 107 Tenn. 23, 38, 64 S. W. 40.

██ ██ Here, the last codicil was executed fifteen years after the original will pretermitting the son Alex. was published, and almost nine years after the first codicil pretermitting the grandchild was executed. It made no change in the disposition of the estate insofar as either was concerned. Therefore, in reality the issue of undue influence was determinable solely with reference to its bearing upon the execution of that codicil. In re Horton's Estate, 128 Cal. App. 249, 17 P. (2d) 184. This follows from the fact that by that testamentary act there was a re-publication of the original will and first codicil, and an adoption of the dispositions thereby made except insofar as they were inconsistent with the second codicil. Sizer's Pritchard on Wills and Administrations, Sec. 10; see, note 87 A. L. R. 836.

██ With respect to the son Alex. there was no evidence of any other or further influence than that above stated having been brought to bear on the testator; nor was there anything to indicate that there was even an attempt to influence him further in respect of his testamentary dispositions. Hence, if the statements testified to by Reece were not otherwise insufficient to serve the purpose they were too distant in point of time to have any probative force. Undue influence is not shown by evidence so remote as to furnish no

reasonable inference that the testamentary act was affected. 68 C. J. 747, 776, 784.

██ ██ Upon the trial below, a substantial part of the battle raged over whether the testator exacted payment for the farm he had given his son, Alex. in 1927. We have already indicated our views about the materiality and relevancy of the facts of this transaction, assuming they were as claimed by the contestants. Whatever may have been the truth about the matter, the fact remains that after the gift is alleged to have been retracted, the testator executed the original will containing the statement that Alex. had been given a 280-acre farm and had thereby been made equal with the other children in the division of the testator's estate. Whether upon an issue of the kind in hand extrinsic evidence contradicting that recital was competent for any purpose, we need not decide. Cf. Bowerman v. Burris, 138 Tenn. 220, 222, 197 S. W. 490. It may be that notwithstanding the alleged belated consideration received from the son, the testator thought there was sufficient value over and above it to place him on a basis of equality with his sisters. But be that as it may, it was not material in a determinative sense upon the issue under investigation. What was material is that the testator made no change in the will in its relation to his son, notwithstanding that continuously thereafter there was present the opportunity to eliminate the statement therein disclosing his intentions in that regard, and to change the dispositions therein made if he desired to do so, and this is especially true when the codicils were executed, the first some six years and the second some fifteen years thereafter. If the result was to disinherit the son either partially or entirely, that fact in the circumstances of this case was

not relevant evidence that the testator was unduly influenced in so doing. To hold otherwise would be to draw a conclusion from a major premise which the law does not concede. It does not require that a man make an equal distribution of his property. Being mentally competent, his right to disinherit any one or all of his children is no less than his right to bestow his property upon them. This right is in no sense dependant upon whether his act was just or unjust in the eyes of others. If in his testamentary dispositions, he departs from the course usually and ordinarily followed in like circumstances, he is presumed to have done so for rationally conceived reasons, satisfactory to himself. That they may not be satisfactory to others is irrelevant. Bowerman v. Burris, supra; see, Wigmore on Evidence, Vol. 1, Sec. 30.

However, in any view of the matter, to sustain the verdict in the aspect affecting the son Alex. we would have to say that the general statements testified to by the witness, Reece, as having been made by the beneficiaries, were operating after the lapse of fifteen years to the extent that they amounted to undue influence. As already said, we think the record is barren of any evidence which would warrant such a conclusion.

The same line of reasoning applies to the will insofar as it pretermits the grandson. The undisputed evidence was that in executing the last codicil the testator not only remembered that the child had been denied participation in his estate but that in effect he reiterated a desire that this be done. At that time some eight years and about nine months had intervened since the statements had been made which were relied upon as constituting undue influence in the pretermission of the grand-

son. The rumor forming the basis of these alleged representations to the effect that Reece had poisoned his first wife apparently had long since ceased to circulate. There was no evidence that it was ever discussed after 1936, even among the members of the testator's family.

It was made to appear that in the intervening years the testator had demonstrated a vigor of mind and intellect wholly inconsistent with the view that he was easily influenced or dominated. In addition to the fact that during that time he successfully operated a 340-acre farm, engaging in various business transactions, the contestants themselves furnished direct evidence that in matters which he apparently regarded as important he independently formed his own opinions and once settled upon a course was not easily swerved therefrom.

Thus the contestant Alex. Culberson testified that the testator's wife and daughters strongly and vigorously opposed the purchase in 1940 of the 340-acre farm. The wife desired very much to remain on the place where she and testator then lived. He made the purchase notwithstanding the efforts to dissuade him, and in doing so, according to Alex., made the best trade he made in his life.

Again, when his stomach ailment developed into cancer and had been so diagnosed, his physician advised an operation and urged him to have it performed. All the members of the family, including his wife, two daughters and his son Alex., likewise endeavored to persuade him to follow this course. Their efforts were altogether unsuccessful. The reason assigned by the testator was that the operation would cost too much and would probably do no good anyhow.

We are therefore compelled to conclude that there was no reasonable basis in the evidence for the view that the nine year old accusations against the grandchild's father operated on the testator's mind to such an extent that he was unduly influenced in executing the last codicil.

Upon the contrary, we think it more probable that the pretermission of the grandchild in the first instance and the ratification of that act by the execution of the last codicil was due to a not altogether unnatural resentment over the refusal of the father of the child to allow the testator to rear him as a member of his family, aggravated no doubt by the refusal of the father and grandmother to permit the child to visit the testator. At the time the second codicil was executed, the testator had seen the child but once in the nine years since his birth and so far as appears never saw saw him afterwards. He was being reared a stranger to the testator under the supervision of a stepmother who after a comparatively brief interval succeeded the testator's daughter as the wife of the child's father. Human nature being what it is, it hardly was to be expected that in these circumstances the testator would regard the grandchild with much favor. This likely would be true in the case of the average man. However, the question is not determinable by objective standards but from the standpoint of the testator. In a legal sense a will is unnatural only when contrary to what could be expected of the particular individual in question, considering the type of man he was as manifested by his views, his feelings, his intentions and the like. When natural by this test, it cannot be said to be unnatural in the legal sense, however much it may differ in his dispositions from those ordinary men make in similar circumstances. 68 C. J. 791.

 If, under the evidence regarded in the light most favorable to the contestants, it was a reasonable view (and as indicated, we think it was), that the pretermission of the grandchild was due to the fact that except for the tie of blood the child was a virtual stranger to the testator, coupled with resentment over the fact that his custodians declined to allow him to visit in the testator's home, the finding of undue influence in compelling the testamentary act was not warranted; for to establish undue influence, it is not sufficient that the evidence be consistent with that hypothesis. It is necessary that it be inconsistent with the contrary. 68 C. J. 778, 779.

 In conclusion, we quote the following from Peery v. Peery, supra [94 Tenn. 328, 343, 29 S. W. 4], which seems to us to be peculiarly apt: "In all cases where undue influence is attempted to be proven, the case must turn, not upon the number of witnesses examined, but the character and force of their testimony; and the inquiry is, does the testimony go to the extent of showing the exercise of such undue influence and dominion by the wife over the husband as depriving him of his free agency in making his will, and made it her will instead of his? If it fail to come up to this point, it matters not how great the number of witnesses, or how large the volume of testimony, there is no proper or legal evidence upon which to set aside the will."

 For the reasons stated, we are unable to escape the conclusion that there was no evidence of this character in the present case. Since we have also held that there was no relevant evidence of a substantial nature showing that the testator was materially incapacitated to make a will, it follows that we think neither issue should have been submitted to the jury.

The result is that the judgment is accordingly reversed, and since the sufficiency of the proof to show the formal execution of the will is not questioned, the proponents' motion for a directed verdict in favor of the will is sustained. The case is remanded to the circuit court, with the direction that a judgment be there entered, probating the will, and the proceedings certified to the county court of Obion County in accordance with the pertinent provisions of the Code. The cost of the cause, including the cost of the appeal in error, are adjudged against the contestants.

Baptist and Hamner, JJ., concur.