JEAN HAGER, Executor, Plaintiff in Error v. J. G. HAGER et al., Defendants in Error.

Middle Section. December 6, 1930.

Petition for Certiorari denied by Supreme Court, April 4, 1931.

24

W. R. Chambers, of Lebanon, J. D. Hankins, of Hartsville, Roberts & Roberts and Aust, Cornelius & Wade, of Nashville, for plaintiff in error.

Pitts, McConnico & Hatcher, Seth M. Walker, and John J. Hooker, all of Nashville, for defendants in error.

JOSEPH HIGGINS, Sp. J. This is a will contest the issues of which involve the validity of a codicil to the principal or original will of one J. L. Moseley, deceased. The prior will was executed in the year 1918. The codicil assailed was added on the 25th day of August, 1928. Both instruments were signed by the testator and were properly witnessed as respects the formal execution of the papers. Moseley was a childless widower.

By the will of 1918 he had given the whole of his estate to his then living wife. She predeceased him some few weeks. Mrs. Moseley left surviving her as the issue of a former husband a son by the name of Jean Hager and two grandchildren, the issue of a deceased son.

It is conceded that if the original will stands without modification the estate goes one-half to Jean Hager and the other half to J. G. and Carl Hager, the grandchildren of Mrs. Moseley. The effect of the codicil, if upheld, will be to pass the whole estate to Jean, he being named the sole beneficiary in the codicil and nominated as executor of the estate.

A short while after the probate of the original will and its codicil in the County Court at Nashville, the grandsons sought to contest the codicil upon the ground that it had been procured by fraud and through the undue influence of Jean Hager and that at the time of its execution the testator was lacking in mental capacity. The controversy thus raised by petition reached the Circuit Court of Davidson county by orderly procedure. It was there tried before the Judge and a jury. The verdict was against the validity of the codicil. His Honor declined to disturb this finding of the jury. He overruled all the grounds for a new trial urged by the executor and proceeded to declare the codicil to be no part of the will of Moseley. He likewise taxed the cost of the contest to Jean Hager.

The executor has appealed and has assigned some seventeen or eighteen errors, all of which will receive from us more or less consideration in this opinion.

The points of attack upon the codicil are not embraced in pleadings in the shape of special pleas. Will contests should not be

tried under such pleadings when there is a multiplicity of issues. But this is a remark in passing.

The contest was waged before the court and jury upon three general issues of fraud, undue influence and lack of mental capacity. The verdict was a general one and to the effect that the codicil was not a part of the will of the testator.

In view of the contention of learned counsel for contestants, they urging with equal earnestness and force that all the assaults made upon this codicil were shown to have tainted this testamentary paper, we do not feel that we can uphold the verdict of the jury if we should find that material and prejudicial error was committed with respect to any one of the issues submitted. It is impossible in such case to assert that a vital error upon any one point or issue is harmless. This for the reason that the court cannot separate the issues and say that the verdict of the jury was founded upon one conclusion or another.

We shall refer to Jean Hager as the executor. The nephews shall be referred to by us in this court as the contestants.

The first contention urged by the executor is that there is no material evidence to sustain the verdict of the jury. Under appropriate subdivisions it is insisted, (1) that there is no material evidence tending to show fraud; (2) that there is no material evidence tending to show undue influence; and (3) that there is no material evidence tending to support a finding of mental unsoundness.

We have given this testimony most careful scrutiny. The conclusion at which we arrived is in brief that there is under the rules obtaining in this State material evidence tending to show, or from which there might be the inference of undue influence and also as tending to establish lack of testamentary capacity. The evidence respecting fraud does not strike us as material and determinative; it is rather of the vague, speculative kind. But with respect to the issues of undue influence and mental capacity we feel constrained to overrule this assignment of error. We make the distinction as to the issue of fraud for the reason that with respect to the procuring of the execution of wills, the fraud that will vitiate must be of the active, tortious, deceitful kind, and not of the constructive or resultant nature. Hence our conclusion that there is no evidence of substance and weight tending to prove this species of fraud. But we observe that this issue was bound up with the other issues and particularly that of undue influence. The consequence is that the insufficiency of the evidence upon this point does not warrant a setting aside of a verdict sustainable upon other grounds. The result is that the first assignment of error is overruled.

When there is evidence tending to show or from which there could be the inference of mental unsoundness at the time of the execution of a paper assailed, a question of fact arises which must be passed upon by the jury. Kirkland v. Calhoun, 147 Tenn., 388.

Where the sole beneficiary of a will has had the opportunity to exert an influence with a showing of circumstances which might suggest the exertion by him of undue influence, the question of its existence is one of fact that must be submitted to the jury. Fitch v. Trust Co., 4 Tenn. App., 87.

It is urged by learned counsel for defendants that the verdict is so plainly in accord with the preponderance of the evidence and that it is so manifestly correct as that all the assumed errors should be treated as immaterial. We cannot subscribe to this view of the testimony. We are unable to say that the evidence preponderates in favor of the verdict of the jury. There is a vast deal of evidence upon which the jury could have found a verdict sustaining this codicil. With this status confronting us we must test the errors of law without much predilection or desire to uphold the verdict of the jury.

Will contests are always surrounded by confusion and uncertainty and fraught with great possibilities of the miscarriage of justice. Will contests at the hands of juries were unknown to the common law and in a great many states these controversies are tried by the court. In those states where jury trials are provided it behooves the court to try them with extreme care. Often is it the case that twelve men entertain the view that they could have made a much better will for a dead man than the one the validity of which they are called upon to pass. Juries not infrequently become too democratic, too pronounced levelers when they are called upon to determine what should be done with the estate of a dead person.

The second assignment, which is in substance that there is no evidence to show or support the finding of fraud and undue influence, must be overruled for the reason that it is quite the same in substance as that which was urged under assignment number one.

In the third assignment the executor assails the action of the court in charging the jury as follows:

"The testimony of a conversation between Jean Hager and Dr. A. J. Hager, occurring since this contest was instituted, has been admitted. I charge you that if this was an effort to compromise this suit or claim, then you shall not consider what was said in this conversation for any purpose whatsoever. But if you should be of the opinion that it was an attempt and an effort to bribe or exert wrongful influence, then

you may consider it as a circumstance reflecting upon the credit that you will give to the testimony of the witness Jean Hager, and for this purpose only.''

We shall in this connection take up assignment number fifteen, for the reason that it deals with a species of testimony that is referred to in the charge criticized. The contention in this assignment is that the court was in error in allowing Dr. Hager, the father of contestants, to testify in substance that in a conversation taking place at Hartsville Jean had said in substance that he wanted the witness to help him get matters settled between the contestants and Jean by calling off the lawyers and abandoning this litigation, and that if the witness would do this he would pay the witness some money or buy him a home, or both.

These two assignments present an interesting question, namely, the competency of all evidence with respect to conversation in which the subject of a compromise is broached. In this jurisdiction the courts are committed firmly to the doctrine that no testimony bearing a suggestion of a compromise pure and simple is inadmissible; and the wholesomeness of this rule cannot be questioned, although it is subjected to much criticism at the hands of Professors Wigmore and Chamberlayne.

But when involved with the compromise offered there is a suggestion of bad faith or an admission of trickery or deceit, or of importunities amounting to a purchase of influence, the rule forbidding testimony having some relation to the settlement of controversies should not be held to exclude evidence of that nature. See 22 Corpus Juris, 314 for a statement of the principles governing this kind of evidence. An analysis of the testimony offered through Doctor Hager, reveals, if true, an effort on the part of Hager to enlist for a price the aid of the witness in inducing a dismissal of a pending controversy. We believe that this feature distinguishes these offers of proof from those that have been uniformly excluded because they have reference to a compromise.

His Honor was in error in submitting the conditional nature of this testimony to the consideration of the jury. It is always the province of the trial judge to determine for himself the competency or incompetency of evidence offered, and this power may sometimes embrace a finding of fact as a preliminary to his ruling. And this is particularly so with reference to testimony tending to show an offer of settlement. 2 Cham. Ev., sec. 1458.

But the submitting of the issue to the jury by his Honor could not have been prejudicial to the executor in view of our holding that his Honor was not in error in letting this evidence go to the jury in the first instance.

It is urged in these assignments that this evidence in addition

to its bearing on the question of a compromise was collateral, and likewise that it should have been introduced at an earlier stage of the cause. There is nothing in this contention. The trial judge can at any time relax the rule respecting the stage at which competent testimony can be introduced. We are also of the view that these efforts of the executor, if shown, were so far material as that they could have been offered at an earlier stage of the trial and that in no sense does it have reference to a collateral issue.

It is insisted that his Honor assumed the possibility of a bribe upon the part of Jean Hager and that his Honor was without warrant for the assumption or use of this term. We find such phraseology in the record as to warrant the inference that the executor was seeking to purchase the influence of Dr. Hager. In fact, the the very word "bribe" was used in the testimony. Hence, we see no substantial error in the charge based upon the fact that the word was used in the excerpt criticised. The result is that we shall overrule the third and fifteenth assignments of error.

The predicate of the fourth specification is an instruction of the court as follows:

"Fraud is undue advantage. It may be of an active nature that is decided by making material statements that are not true, or false, or unjust; or it may be the concealment of facts that are material, and had such been known, the thing done would not have been done.

"Undue influence is where a person becomes so subject to the will and influence of another that the person is so influenced that he is under the domination and control of another to such an extent that he does a thing that otherwise he would not have done while acting as a free agency; and if the preponderance of the proof shows that a will was made through fraud or undue influence as above defined, then such would not be a last will and testament, and you should so find and report."

We are of opinion that there is merit in this assignment. We are not satisfied with the definition of fraud as given by his Honor and do not have much difficulty in arriving at the conclusion that it amounted to a misdirection.

When the court said that fraud was undue advantage and that it might be of an active nature "that is decided" by making material statements that are not true or false, or unjust, he was too broad. A jury might in dealing with family relations treat an advantage obtained by kindness as undue; or the jury might treat many trivial acts or statements as untrue and unjust. We have observed before that in order to set aside a will on the ground of fraud, the fraud must be of a tortious, deceitful and wrong-intending

nature. Hence, it is not every misstatement that is material and not every statement that is in the legal sense false, and not every exertion of influence that is unjust. Again, the court proceeds to say that fraud may consist of the concealment of facts that are material and had such been known the thing would not have been done. Both fraud and undue influence must have direct influence on the act of executing the will and for that reason such general statements as are found in this charge left the jury too wide a field in which to travel.

The only portion of the charge dealing specifically with undue influence is that which we have just quoted. While standing alone the language used would not be pronounced to be positively erroneous, it was not as specific or applicable as it should have been.

The executor sought to supply this deficiency by a special request copied in the ninth assignment. This special request is as follows:

"I charge you that 'To void the will on the ground of undue influence, it must appear that the influence was exerted upon the very act of making the will. The fact that the testator was under the general and even controlling influence of another person in the conduct of his affairs will not ordinarily suffice to invalidate the will, unless that influence was specifically exerted upon the testamentary act, and did to some extent mislead him to make a will essentially contrary to his duty or inclination.' "

The language used by the draftsman of this request is unquestionably that which has been approved time and time again by our decided cases and by other authorities, and it will be hard to improve upon this phraseology. We are of opinion that the executor was entitled to this instruction and that it was error to refuse to give it in charge. We need not burden this opinion with citations of authorities to the effect that the undue influence which will destroy a will must have been exerted and operative in the very act of making the will. The bringing to bear of influence of any nature will not suffice to invalidate a will unless it was effective to cause the execution of a will contrary to testator's duty and inclination. That this influence must be exerted upon the testamentary act and must bring about and be the cause of the execution of the particular provision assailed must always be impressed upon the jury by the court. His Honor fell somewhat short in this regard.

It is well known that a litigant has the right to have his whole theory embodied in an instruction or a set of instructions, and this right extends to the presentation of those theories in approved language. It is true that it is not for the counsel to choose the

words in which a charge shall be embodied, but it is undoubtedly true that a party may insist that the rule of law adverted to in the main charge is amplified or made more certain. Especially is this necessary or advisable in a case where the greater portion of the testimony relates to other times and occasions than the specific period or point of time at which the instrument was executed. The requested instruction was apposite for the additional reason that the greater range of the testimony in so far as it bore upon the question of undue influence, was of a general and extensive nature and application, rather than as having a direct bearing upon the time of the execution of the paper. These observations call from us the reiteration that the executor was entitled to an instruction that the undue influence and fraud which would work the destruction of a will must have been effectual and effective at the very time of execution. We are therefore constrained to sustain the fourth and ninth assignments of error.

The basis of the fifth assignment is an instruction of his Honor as follows:

"Statements and declarations of the deceased, that is, the testator or the maker of the will, whether made before or after the execution of the will, are competent evidence to show a valid execution of the will, or testator's mental capacity, his knowledge of the contents of the will, his comprehension and approval of its contents, and his capacity or susceptibility to be influenced, should be looked to along with all the other proof and circumstances in the case."

In connection with this assignment we take up and consider the eleventh assignment, which is predicated upon the refusal of the Circuit Judge to give in charge special request number six, which request is as follows:

"I charge you, that when the condition of the testator's mind at the time of executing the purported will and its consequent susceptibility to impositions are involved on an issue of undue influence, his declarations are admissible without regard to when or in whose presence they were made, so far as they show his previous purposes and intentions and his state of mind at the time of making the will, and it is competent for the parties to show, upon the one side, that his statements made prior to the making of the will indicated a purpose to dispose of his property in the same manner as is done in the will, and upon the other side to show that testator made statements prior to the date of the will in conflict with the terms and provisions of the will. These antecedent declarations of testator, if proven by credible witnesses, are entitled

to be given such weight as to the jury may seem right and proper.''

The excerpt embodied in the fifth assignment cannot be pronounced to be positively erroneous, and if it were not blended with the substance of the eleventh assignment, would hardly justify a ruling that it was material and reversible. We make this observation for the reason that to the extent that it did go it laid down correct principles of law. The criticism made, and the one to which we assent, is that it was not as extensive or as accurate as it should have been. It is now established in Tennessee that the declarations of the testator both before and after the execution of his will, are admissible when the due execution of the will is in dispute, or when the competency of the testator is involved, or when the susceptibility of the testator to undue influence is suggested and involved in the other issues. But at no time can the declarations of a testator be affirmative or competent evidence tending to show the fact of undue influence. An approved statement would be and is that if there be other circumstances indicating or tending to prove the fact of undue influence, that is, the substitution of another's will for that of the testator, then the extent of that influence independently shown may be revealed by proving the declarations of the victim of that undue influence.

As the instruction stood these declarations of the testator might be considered by the jury in connection with all the other proof for any and all the purposes of the case.

The request embodied in assignment number eleven merely requested the court to state to the jury in connection with his main charge that these declarations were pertinent as showing his previous intentions and the state of mind at the time he made the will and then proceeds to call attention to the operative effect of statements made prior to the execution of the will to be contrasted with the provisions of the will, with the view of determining the extent to which the influence was operative and effective.

It is true that the executor could have presented the request that these declarations are not competent proof to establish undue influence. But notwithstanding this, we are of opinion that the distinctions embodied in this request would have tended to clarify an issue very much involved. The request was sound to the extent that it went. Because of the view we take of the insufficiency of the language quoted in assignment number five, and the propriety of giving instruction in the request number eleven, and because of other assignments treated by us as good, we are suggesting an alteration of the language of his Honor upon another trial.

The sixth assignment of error is grounded upon the refusal of

the court to grant request number one presented by the executor. This request was as follows:

"A man may freely make his testament how old soever he may be, for it is not the integrity of the body, but of the mind that is requisite in testaments. The law looks only to the competency of the understanding, and neither age, nor sickness, nor extreme distress, nor disability of body will affect the capacity to make a will if sufficient intelligence remains."

The executor was entitled to this instruction. It is true that his Honor had touched upon the subject of age and bodily infirmity; but the language used by him fell short of the full and correct statement of the rule to the effect that the law does not adjudge to be invalid a will made by a man who is extremely aged or very sick or in extreme distress.

In assignment number seven the executor complains that the court committed error in refusing to give a special request which was in substance that the court justly regarded with tenderness the will of the aged; that the power to dispose of property is often the only means of securing attention and obtaining natural affection, and becomes the sole staff of the declining years, and that undue influence may assume the form of a mere kindness, and that if Jean Hager by his acts of kindness had endeared himself to Moseley, then by means of such kindness and without fraud said Moseley while having sufficient capacity so to do made and published the codicil herein questioned, the same will be good and valid.

This request is objectionable for the reason that it is somewhat involved and is argumentative. It is likewise short of what such request should have been in that it did not present distinctly the prerequisite that the testator fully understood and approved the contents of his will, and that the same expressed his testamentary desire. We are not able to see that this instruction was needed to present any more clearly the issue of undue influence than that which was embraced in the request adverted to on the ninth assignment of error. Our chief reason for disapproving this request is that it is an involved and argumentative undertaking to justify the obtention of the benefits by zealous attention to the wants of an aged man. Instructions should be more simple.

In the eighth assignment the executor insists that the court committed error in refusing to give in charge his special request number three. This one is quite lengthy. The substantive statements of the law embraced in that request appear to us to be sound. But at the same time it embraces a great long argument and is illustrative, analytic and too much amplified. It has often been said that requests or instructions should not be transcripts of the work

or reasonings of the appellate courts, but that the judges and attorneys should extract the essential rules upon any phase of a case and should state them in plain language. The many propositions embodied in this special request were sound and were pertinent, and some of them were not touched upon by his Honor in his general charge. But the essential and controlling proposition embraced in this request number three is found in the request number four, a request which we have above ruled should have been given. Our holding upon this assignment is that the Circuit Judge cannot be put in error for having refused to give it in charge although it would not have been reversible error had he given it.

Assignment number ten is grounded upon the refusal of his Honor to give in charge the executor's special request number five. This request is as follows:

"The burden of proving the formal execution of the will is always on the proponents, but when this has been done the presumption of law is in favor of the sanity of the testator and the will may be read to the jury. The burden of overcoming the legal presumption of capacity and showing a want of it by clear and satisfactory evidence, is upon the parties impeaching the will, and the same rule of law applies with respect to the burden of showing fraud and undue influence."

There can be no gainsaying the proposition that this special request embodied sound rules of law. Nor do we find a sufficiently clear statement with respect to this point in the main charge of his Honor. It has for a century or more been understood in this State that when a will bearing the signature of the testator and two subscribing witnesses is produced, the presumption arises as a matter of law that the testator had sufficient testamentary capacity and that the instrument embraced his testamentary wishes, and that it is incumbent upon any person who avers that testator was lacking in capacity, or that he was the victim of fraud or undue influence, to prove those invalidating grounds by preponderance of the evidence. We are of opinion that the executor was entitled to that instruction in this cause because of the peculiar surroundings of the litigation and because of many points found in the life of the executor and the fact that he was chief beneficiary affording the contestants quite a vantage ground that should have been balanced by the requested instruction. We therefore sustain this tenth assignment of error.

The twelfth assignment is founded upon the refusal of the court to grant the executor's special request number seven, herein below copied:

"In a case like the present where the question of sanity or insanity of a person is involved, it is competent for both

parties to offer the testimony of witnesses, both expert and non-expert. By expert witnesses is meant physicians who, by reason of their education, training and experience, are able to express an opinion or state their conclusions as to the condition of the mind of the person under investigation. Attesting witnesses, and they only, are permitted to give their opinion merely without stating the facts upon which they are based. Physicians may state their professional opinions, but such opinions are not conclusive, and may be shown to be incorrect.

"Non-expert witnesses, after first stating the appearance, conduct, conversation, or other particular facts from which the state of the testator's mind may be inferred, are at liberty to state their inferences, conclusions or opinions, as the result of these facts. But after all it is the facts which the witness details and conduct which he describes, which chiefly and primarily constitutes the testimony to be relied on, and the witnesses opinions are entitled to little or no regard, unless supported and warranted by the facts he states.''

There is nothing in the general charge of his Honor with respect to the rules by which to test and weigh the evidence of non-professional witnesses. Neither is there any instruction showing the difference between expert and non-expert testimony. There is certainly no guide by which to determine what credit is due a large number of the witnesses.

We here again observe that will contests should be tried with caution and solicitude and that the jury should be given the results of the experience of the courts in determining the credibility of witnesses; and in particular should the court lay down the guides by which to weigh the dangerous line of evidence so often met with in these contests, namely, that of the opinion of non-expert and non-discriminating witnesses.

The latest commentary upon this species of testimony is found in the opinion of Mr. Justice DeWitt in Fitch v. American Trust Company, supra. In no other controversy involving mental capacity should the qualifications of such witnesses be more closely scrutinized. Instructions in substance like the one embodied in request number seven have for so many years been found in charges delivered in will contests as to warrant the statement that such instructions should be given as a matter of course and in the first instance. Nor will general instructions by a court with respect to interest or lack of interest, opportunities, etc. suffice. For these reasons this assignment number twelve is sustained.

The thirteenth assignment is predicated on a statement made by the Circuit Judge to the jury upon their return into the court

room with the statement that they had not agreed. His Honor said to the jury as follows:

"I don't know whether I told you all when I empaneled you here, I don't remember; I am going to tell you now; it is always for the best interest of the courts, the litigants, and everyone, if a jury can consistently do it under the law and the facts of the case, that you get together; that is to the best interests of the litigants and the best interests of the courts. It is known, of course, that lawsuits are very expensive. While that is something that, of course, you wouldn't have a right to sacrifice your individual opinion or your idea as to the law or the facts to; a juror should not sacrifice his conviction to a consideration of that. Also, it is true, gentlemen that a majority may be right; it is true that a minority may be right; but it is always well for each side to duly consider the stand and the position of the other; and it is always well that a minority should give consideration to the arguments and the reasoning of the majority. The majority, as I say, may be right, and be wrong, but it is usually well, and it is proper, for the minority to give due consideration to the majority."

We are of the opinion that the last sentence of this instruction is subject to criticism and we therefore disapprove it. There is nothing in any of the preceding portions of this statement which can be criticised. It cannot be doubted that judges may remind juries of the fact that lawsuits are expensive and that they should be terminated and that the jurors should reason among themselves and that the one side or the other should not stick stubbornly to any opinion which might be entertained. But it was error for the court to conclude his observations by the statement that "it is usually well and proper for the minority to give due consideration to the majority." Such an instruction or one in substance like it, has been disapproved by the courts. We interpret this language as an instruction to the minority to pay great heed to the opinions of the majority and to yield to the majority. We say the tendency of that instruction was in that direction (see 38 Cyc., 1858) and to that extent was vulnerable.

It is urged by learned counsel for the contestants that this cannot be urged as an error for the reason that there was no exception or objection made to this statement by the court at the time it was rendered, and many authorities are adduced to support this. We are of opinion that the decisions referred to must be considered in the light of the practice obtaining in the several States in which they were delivered. In a great many States of the union the practice of the Federal Court is followed in respect to the

noting of exceptions to any instruction, general or special, given by the court to the jury. In this State there is no such requirement. Attorneys are not required, except through the medium of a special request, to raise objection to a Judge's instructions. Admittedly special requests are not appropriate for the purpose of recalling or correcting a palpably erroneous statement of the court. Waterbury v. Russell, 8 Baxt., 159; Malone v. Sea, 8 Lea, 91. We sustain this assignment.

In assignment number fourteen a certain other statement made by the court to the jury pending their deliberations upon the case is challenged. The statement of his Honor embodied in this assignment is as follows:

"Gentlemen, I am glad to see our brother juror back: Gentlemen, you all took this case under consideration Saturday after I had charged you, and my remembrance is that you considered the case somewhere around forty or forty-five minutes, somewhere about that time. You spent some time in trying the case. It is a case of some importance. It is a case that involves an outlay of money to try, both in so far as the county is concerned and in so far as the litigants are concerned. I am in hopes you all will be able to reach a verdict in the case, for, as I might have well said to you, it is always well that litigation should be terminated, for it is to the interest of the courts and litigants, you understand, if that can consistently be done. Every juror is entitled to his own conclusions that he reaches from the law and the evidence in the case; and every juror should give due consideration to the opinions and conclusions of his fellow jurors. One thing, gentlemen, I would caution at this time; don't discuss anything you do—that is entirely within the province of the jury, your deliberations. It is not well before a case is concluded that any idea escape as to any of the doings of the jury; and after you have reached a conclusion it is well that you keep your peace from everybody, as to what you did and how you did it, and the way and manner in which you reached the conclusion. Some times random talk by individuals and by jurors may create a situation that is not wholesome. So for that reason it is well to keep your deliberations on everybody,—me, court officials, litigants and the public. All right, take the case, gentlemen."

No one can disagree with his Honor about the greater number of the observations in this statement. We disapprove however of that part of this instruction to the effect that when they have reached a conclusion it is well for them to keep their peace and to tell no one the way and manner in which they reached their con-

clusions and that it would be well for the jurors to keep their deliberations entirely to themselves.

The general rule is that courts will not listen to jurors who undertake to stultify themselves. The practice or rather the attitude of the courts discourages the disclosure by the jurors of their methods of disposing of the cases before them. But there is a greater and more fundamental rule, and that is that the jurors must perform their functions strictly in accordance with the laws of the land and this forbids their considering any extraneous circumstances or imparting information to their fellow jurors, or their resorting to a quotient verdict, or to any method of obtaining a result by artificial and unreasonable means. We do not think it healthy for the jurors to be instructed that they cannot be interrogated about the way in which they have disposed of a case. We believe it will be better for these triers of the facts to have in mind the possibility of their being subjected to interrogation; and that it is not conducive to a fair and impartial trial for the Judge to assure a juror that he will be protected if he refuses to impart any information whatever as to those rules by which he reaches a verdict, or the considerations that moved him to a certain result.

It is difficult in this case to ascertain to what extent this instruction may have influenced the jury. It may have not done so at all. But we shall write our mild disapproval of this statement by the learned Circuit Judge to the triers. It is urged in this connection and in connection with all the other assignments that they are bad for the reason that the conditions or considerations rendering them prejudicial do not appear upon the face of the several assignments. It is said that the executor has merely specified and averred certain things to be erroneous and harmful, without also embodying the reasons why the so-called errors were prejudicial. Hence it is urged that we should disregard the greater portion of the assignments of error. And it is reiterated that all the assignments of error are immaterial.

Responding to the first of these positions immediately above stated, it suffices to say that with respect to each assignment counsel for the executor in the brief following the specifications of error urged the reasons why in their opinion the several errors pointed out were such and were harmful. This is a sufficient compliance with the rule requiring the setting forth of the reasons why assignments of error are well based and prejudicial. In other words, the specifications of error made in one part of the brief are followed later by the reasons why the criticised actions were erroneous. These points may be elaborated in a subsequent portion, provided of course the reasoning and argumentative parts be aptly connected with and referred to the preceding assignments of error.

Responding again to the insistence that all errors should be treated as immaterial, it strikes us that the jury attached undue importance to the admittedly malodorous life and reputation of the executor, forgetting that the testator might if he so willed, give the whole of his estate to the lowest reprobate living. Nor can we escape the persuasion that the jury were greatly impressed with the opportunities enjoyed by the beneficiary to influence the testator, and did not sufficiently weigh the great volume of testimony to the effect that the codicil contained the long cherished plan and wishes of the maker.

It is difficult to erect any standard by which to determine whether errors are material and prejudicial. Underlying all applications of these doctrines is the well-founded rule that the appellate court must have the well founded conviction that justice has been done. This conviction we are unable to entertain.

The old rule was that every error committed by a lower court was presumed to be harmful. The latter day practice is to assume that no error is prejudicial until shown to be such. But when we are not satisfied with the result reached and in reviewing the record can find errors capable of causing a verdict or judgment not meeting our approval, we can well say that such errors were material and prejudicial.

We feel constrained to reverse and remand this cause for a new trial. This renders unnecessary the discussion of that assignment in which it is complained that the court taxed the executor personally with all the costs of the contest, for the reason that a reversal and remand of the case for a new trial will of course do away with that provision of the judgment respecting costs. Contestants are taxed with the costs of this appeal. The costs of the lower court will be dealt with in subsequent stages of the case in the lower court. For the reasons indicated the judgment is reversed with direction that the cause be remanded for another trial.

Crownover and DeWitt, JJ., concur.