IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
SEPTEMBER 21, 2004 Session

## SANDRA KAYE KEMP PARISH, ET AL. v. JERRY DONALD KEMP, ET AL.

### Direct Appeal from the Chancery Court for Carroll County
No. 01-CV-32     Ron Harmon, Chancellor

_____

### No. W2003-01652-COA-R3-CV - Filed March 2, 2005

_____

This appeal arises out of a complaint filed by Appellants seeking to invalidate certain inter vivos transfers made by Decedent as well as the Wills executed by Decedent while living with Appellees. After a hearing in which a jury received evidence from numerous witnesses and exhibits, Appellants sought a directed verdict on whether, as a matter of law, the burden to prove the validity of the Wills and the inter vivos transfers shifted to Appellees. The trial court denied this motion, and the jury returned a verdict in favor of Appellees, upholding Decedent's Last Will and Testament and the inter vivos transfers. Review by this Court is sought by Appellants, and, for the following reasons, we reverse.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Kenneth R. Jones, Jr., Nashville, TN, for Appellants

Robert T. Keeton, Jr., Laura A. Keeton, Huntingdon, TN, for Appellees

# OPINION

## Facts and Procedural History

Mamie Kemp Fesmire ("Aunt Mamie" or "Decedent") was a resident of Carroll County for a majority of her life and lived with her husband, E. Howard Fesmire ("Uncle Howard"), until he died in May 1996. Aunt Mamie and Uncle Howard had no children of their own, and, therefore, Uncle Howard's estate passed to Aunt Mamie upon his death.[1] For a short time following Uncle Howard's death, Aunt Mamie lived by herself in her home in Atwood, Tennessee.

Shortly after her husband died, Aunt Mamie, who was eighty-nine years old, fell and injured herself. While moving her mother, Mildred Inell Kemp Coleman, into her home, Marilyn Aten ("Ms. Aten"), one of Aunt Mamie's nieces, received a call from Annie Jo Kemp ("Ms. Kemp"), notifying her of Aunt Mamie's injury. After having surgery and spending time in a rehabilitation center, Aunt Mamie moved in with Ms. Aten and her family in their home in Pegram, Tennessee.

While living with Ms. Aten and her husband, Aunt Mamie refused to contribute to household expenses or to the expansion of the house in order to have enough room for everyone living in the home. Within a few weeks, it was decided that Aunt Mamie would move out of the Aten's home. Prior to her departure, Ms. Kemp suggested, after a discussion with Ms. Aten, that Aunt Mamie should execute a power of attorney naming Ms. Kemp and Ms. Aten as Aunt Mamie's joint attorneys-in-fact. Former attorney and current general sessions judge James B. Webb prepared such durable power of attorney[2] and additionally prepared a codicil to Aunt Mamie's Will executed in

---

[1] This was pursuant to Uncle Howard's Last Will and Testament.

[2] The durable power of attorney stated that Ms. Kemp and Ms. Aten would have

full power to act, for me and in my stead, to manage and conduct my personal business and affairs, to execute and deliver deeds in my name, execute receipts, receive money and any funds owed me in any manner and deposit the same to my account in my bank, to endorse any checks payable to me for deposit in my bank, and to write, sign, give and deliver checks against my personal account in my bank, and in payment of any and all of my legal debts or obligations; to demand and receive payment from creditors; and to sign all necessary instruments, and to sell and convey and encumber all of my right, title and interest in and into, including but not limited to Settlement Sheets, Contracts, Warranties and Warranty Deeds concerning a house and lot located in the town of Atwood, 21st Civil District of Carroll County, Tennessee, and more particularly described in Warranty Deed from Curtis W. Younger to Howard E. Fesmire and wife, Mamie Fesmire dated August 27, 1962 and recorded in Deed Book ___, Page ___ in the Register's Office of Carroll County, Tennessee, and to otherwise manage my personal affairs and to sign any papers, documents or demands in connection with any of my personal business as fully, completely and amply, to all intents and purposes whatsoever, as I might or could do if acting personally.

1988, amending the appointment of the executor[3] to Ms. Kemp and Ms. Aten, and both documents were executed by Aunt Mamie on July 12, 1996. Subsequently, after exploring the option of having a professional caretaker live with Aunt Mamie in her home, she moved into the home of Ms. Kemp and her husband, Jerry Donald Kemp ("Mr. Kemp" or, collectively with Ms. Kemp, the "Appellees"), in Nashville, Tennessee.

Shortly after moving in with Mr. and Ms. Kemp, Aunt Mamie decided to revisit James Webb's law office, and Mr. and Ms. Kemp drove her to meet with him. At such meeting on August 9, 1996, Mr. Kemp "jokingly" said that he would become Aunt Mamie's attorney-in-fact if she transferred $200,000 to him and his wife, Ms. Kemp. In discussing the transfer of $200,000 to Mr. and Ms. Kemp privately with Aunt Mamie, James Webb felt uncertain of whether she wished to make such a transfer and decided against drawing up documents for the transfer. However, Aunt Mamie executed another power of attorney worded exactly like the power of attorney executed on July 12, 1996, except that it removed Ms. Aten's name as an attorney-in-fact and replaced it with Mr. Kemp's name. Additionally, that same day, Aunt Mamie executed a second codicil to her 1988 Will devising her house in Atwood, Tennessee, to Mr. and Ms. Kemp.[4] Mr. and Ms. Kemp both testified that the second power of attorney and codicil were executed upon Aunt Mamie's suggestion.

After she started living with Mr. and Ms. Kemp, Aunt Mamie began changing the ownership status of various assets. Specifically, she began renewing certificates of deposit not only in her name but in Mr. and Ms. Kemp's names with a right of survivorship, or they were made payable on Aunt Mamie's death to Mr. and Ms. Kemp.[5] Such CD's and checking accounts totaled approximately $450,000, leaving approximately $290,000 to pass pursuant to Aunt Mamie's Will. Mr. and Ms.

---

[3] Aunt Mamie's 1988 Will appointed her husband, Uncle Howard, executor of her estate and Ted Fesmire as an alternate executor.

[4] The only other change the second codicil made was to place Elta Fesmire's share of Aunt Mamie's estate in a trust with Mr. and Ms. Kemp named as the trustees. Elta Fesmire was a sibling of Uncle Howard.

[5] Specifically, a certificate of deposit at the Bank of Huntingdon in the amount of $100,000 was placed in the name of "Mamie Fesmire or Jerry D. Kemp and Annie Jo Kemp" with a right of survivorship on October 3, 1998. Such CD was renewed again in 1999 and Aunt Mamie died before the maturity date in 2000. A CD at Carroll Bank & Trust in the amount of $100,000 in Aunt Mamie's name was made payable on death to Mr. and Ms. Kemp in September 1996. Such CD matured and was renewed every six months until Aunt Mamie died. This CD, while originally payable on death, was placed in joint ownership with a right of survivorship in 1998 and continued in the name of "Mamie Fesmire or Jerry D. & Annie Jo Kemp" until Aunt Mamie's death. A CD at Citizens Bank & Trust in the amount of $100,000 was originally payable on death to Mr. and Ms. Kemp but became payable to "either or survivor" and finally payable to "Mamie Fesmire or Jerry D. Kemp or Annie J. Kemp." Such CD was renewed every six months. A CD at Farmers and Merchants Bank in the amount of $63,000 was issued in October 1996 in the name of "Mamie Fesmire – Jerry D & Annie J Kemp POAs." This CD was renewed in the same name and amount in 1997, but in 1998, the name of the depositor changed to "Mamie Fesmire & Jerry D. Kemp & Annie Jo Kemp." Additionally, the amount of the CD increased to $100,000 in 1998. A checking account with Citizens Bank & Trust was originally in the name of "Mamie Fesmire c/o Annie Jo Kemp" but changed to list Mr. and Ms. Kemp's names on the account. Mr. and Ms. Kemp closed the account and had a cashier's check in the amount of $22,142.57 issued to them after Aunt Mamie died. Finally, an advantage rate money market account with SunTrust Bank was created in the amount of $63,500 in the name of "Mamie Kemp Fesmire or Jerry D Kemp or Annie Jo Kemp."

Kemp and various bank employees testified that Aunt Mamie received private advice and counsel from bank personnel before finalizing any changes in ownership status.

Additionally, Aunt Mamie began paying Mr. and Ms. Kemp's monthly expenses. Such expenses included the monthly notes on Mr. and Ms. Kemp's 1996 Toyota Camry, paying off the balance due on the 1999 Toyota Camry in the amount of $19,900.53, the car insurance for Mr. and Ms. Kemp's cars, the utility bills for Mr. and Ms. Kemp's house, partial payment for Mr. and Ms. Kemp's new roof on their home in the amount of $2,000, the property taxes for Mr. and Ms. Kemp's house in 1999, Mr. and Ms. Kemp's credit card bills, and paying off Mr. Kemp's debt incurred at Farmers and Merchants Bank in the amount of $15,400.

Finally, in November 1996, Aunt Mamie discussed executing a new Will and another power of attorney. She met privately with an attorney, D.D. Maddox ("Maddox"), who discussed the ramifications of her actions. After this meeting, she executed a third and final power of attorney,[6]

---

[6] Though the final power of attorney does not change the attorneys-in-fact, it states that the purposes of the power of attorney include, but are not limited to, the following:

1. To receive and receipt for any and all sums of money, or payments due or to become due to me, to deposit all in my name by them in my behalf;

2. To act for me in any business in which I am now or may become interested;

3. To endorse or make notes, checks, drafts or bills of exchange which may require my endorsement or signature, and to deposit as cash or for collection in any bank or savings institution, or to acquire funds in a like manner;

4. To draw checks against my accounts in any bank or savings institution, to make notes for funds or withdrawals of savings accounts or certificates of deposit with any financial institution;

5. To accept all drafts or bills of exchange which may be drawn upon me in the usual course of my business;

6. To receive the dividends which are now due or which may hereafter become due to me on stock now owned or hereafter acquired in my name;

7. To sell, assign, mortgage, transfer, convey, lease, or set over all or any part of my real or personal property or estate of whatever nature and wherever situated.

8. To purchase real estate or personal property and to sign my name to all necessary instruments incidental to this purpose.

9. I hereby grant an unlimited guardianship of my person to the attorneys in fact named herein, and as a part thereof they or either of them shall have full authority to act on my behalf in nominating a doctor for my medical care, select hospitals and do all other things for my medical care and treatment, and I direct that they shall have the authority and be required

(continued...)

-4-

again naming Mr. and Ms. Kemp her attorneys-in-fact, dated November 5, 1996, and a new Will dated January 7, 1997 (the "1997 Will"). The 1997 Will, naming Mr. Kemp the executor, made various specific bequests, the most significant being bequests of $100,000 to Mr. and Ms. Kemp each. Finally, in 1999, Aunt Mamie wished to execute another Will. On this occasion, she sought the legal services of Walton West ("West") who, after conferring with Aunt Mamie privately about her intentions, drafted a new Will which Aunt Mamie executed on July 13, 1999 (the "1999 Will"). The primary differences between the 1997 Will and the 1999 Will are that the specific bequest amounts for the beneficiaries were modified and the bequests to Mr. and Ms. Kemp were deleted from the 1999 Will. The reason for the deletion of the bequests to Mr. and Ms. Kemp, as West testified, resulted from the fact that Aunt Mamie had converted CD's and bank accounts to joint accounts with a right of survivorship.

By all accounts, Aunt Mamie remained a strong-willed person who was "tight with money" until her death. She had heart problems requiring her to see physicians, and she was required to use a walker while living with Mr. and Ms. Kemp. She died on August 17, 2000.

After Aunt Mamie died, the 1999 Will was submitted to the probate court, and Mr. Kemp was appointed the executor of Aunt Mamie's estate. Subsequently, a complaint was filed and later amended by Sandra Kaye Kemp Parish, Marilyn Coleman Aten, Gary Harlan Coleman, Sr., Jimmie Austin Kemp, William Buman Argo, Nancy Kemp Petty, Charles S. Aten, Angela Y. Aten, Gary H. Coleman, Jr., Vicky Coleman-Bird, Thomas A. Kemp, Michael A. Kemp, and David Argo (collectively the "Appellants"), who are all nieces, nephews, great nieces, or great nephews of Decedent. After a trial before a jury, the Appellants moved for a directed verdict on the issue that a confidential relationship *per se* had been established by the evidence and that the burden of proof, as a matter of law, should fall to the Appellees to prove the fairness of the transactions for their benefit. After the trial court denied the Appellants' motion, the jury returned a verdict in favor of Appellees, finding that the inter vivos transactions and the execution of the 1999 Will were free of undue influence and valid. The Appellants filed a motion for partial judgment notwithstanding the verdict on the issue of which party had the burden of proving the validity or invalidity of the transactions at issue, and they filed a motion for a new trial raising as error the trial court's instructions to the jury and that the jury's verdict was against the weight of the evidence. After

---

[6](...continued)

to withhold medical treatment in the event that there is little prospect for my recovery, and they shall refuse the authority and affirmatively act to stop any medical treatment that would keep me alive by extreme means and/or by mechanical or medical techniques that would not leave me conscious. They shall see that I will have medication to keep me from pain but otherwise shall not prolong my life by extraordinary medical procedures.

10. These persons nominated as my power of attorney will authorize the use of any organs of which I may die possessed useful to any other living person to be used therefore and they are hereby empowered so to do.

denying the Appellants' motions, the Appellants filed a notice of appeal to this Court, seeking review of the following issues, as we perceive them:

I.      Whether the trial court erred when it failed to grant Appellants' motion for directed verdict and instruct the jury that Appellees had a confidential relationship with Decedent as a matter of law creating a presumption of undue influence and requiring the Appellees to prove by clear and convincing evidence the fairness of the inter vivos and testamentary transfers for their benefit;

II.     Whether the trial court erred when it improperly instructed the jury as to how a power of attorney could establish a confidential relationship and failed to instruct the jury that Decedent's inter vivos and testamentary transfers for the Appellees' benefit were presumed invalid because of a confidential relationship;

III.    Whether the trial court erred in its jury instruction concerning: (i) the nature and extent of advice necessary to qualify as "independent advice" for purposes of rebutting the presumption of undue influence arising from transfers for the benefit of a dominant party in a confidential relationship; (ii) the need to prove such advice in order to rebut the presumption; and (iii) the effect of that advice on the presumption of undue influence; and

IV.     Whether there is any material evidence to support the jury's verdict in favor of the Appellees.

For the following reasons, we reverse and remand for further proceedings.

**Standard of Review**

The Tennessee Supreme Court has previously addressed an appellate court's standard of review for an order on a motion for directed verdict:

> A directed verdict is appropriate in a will contest case only when the evidence in the case is susceptible to but one conclusion. *See Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994). An appellate court must take the strongest legitimate view of the evidence favoring the opponent of the motion when called upon to determine whether a trial court should have granted a directed verdict. *Id*. Furthermore, all reasonable inferences in favor of the opponent of the motion must be allowed and all evidence contrary to the opponent's position must be disregarded. *Id*. Ultimately, an appellate court "may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Id*. (citations omitted).

*Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002).

This Court has also addressed the standard of review for appellate courts when examining jury instructions:

> Appellate courts give trial courts leeway with regard to the substance of their jury instructions in will contest cases. *Thomas v. Hamlin*, 56 Tenn. App. 13, 37, 404 S.W.2d 569, 579-80 (1964). However, they should prepare their instructions with care because "will contests are always surrounded with confusion and uncertainty and fraught with great possibilities of the miscarriage of justice" and because jurors have a natural tendency to superimpose their judgment on the testator's. *Hager v. Hager*, 13 Tenn. App. 23, 27 (1930).

> The trial court's instructions are the jury's only proper source of the legal principles to guide its deliberations. *State ex rel. Myers v. Brown*, 209 Tenn. 141, 148-49, 351 S.W.2d 385, 388 (1961). Accordingly, trial courts should give substantially accurate instructions concerning the law applicable to the matters at issue. *Street v. Calvert*, 541 S.W.2d 576, 584 (Tenn. 1976). The instructions need not be perfect in every detail, *Davis v. Wilson*, 522 S.W.2d 872, 884 (Tenn. Ct. App. 1974), as long as they are, as a whole, correct. *In re Elam's Estate*, 738 S.W.2d 169, 176 (Tenn. 1987).

*Mitchell v. Smith*, 779 S.W.2d 384, 390 (Tenn. Ct. App. 1989). Finally, we are mindful that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d) (2004).

## Directed Verdict on Confidential Relationship

First, Appellants argue that the trial court erred when it failed (1) to grant their motion for directed verdict on the issue of the existence of a confidential relationship between Decedent and Appellees and (2) instruct the jury that the presumption of undue influence arose requiring the Appellees to prove the fairness of the transactions at issue by clear and convincing evidence.

"Under Tennessee law, as in most jurisdictions, a presumption of undue influence arises where the dominant party in a confidential relationship receives a benefit from the other party." *In re Estate of Hamilton*, 67 S.W.3d 786, 793 (Tenn. Ct. App. 2001) (citing *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995); *Crain v. Brown*, 823 S.W.2d 187, 194 (Tenn. Ct. App. 1991)). "[A] confidential relationship arises as a matter of law when an unrestricted power of attorney is granted to the dominant party." *Childress*, 74 S.W.3d at 328-29 (citing *Matlock*, 902 S.W.2d at 386; *see also In re Estate of Hamilton*, 67 S.W.3d at 793; *Mitchell*, 779 S.W.2d at 389 ("A person authorized to act on behalf of another by virtue of an unrestricted power of attorney has a confidential relationship with the person who executed the power of attorney.")). No confidential relationship arises when an unrestricted power of attorney is executed but has not yet been exercised. *Childress*, 74 S.W.3d at 329. A power of attorney is restricted and a confidential relationship does not exist as a matter of law when the power of attorney never came into effect and the person granting the

power of attorney may alter or revoke it at any time. *McKinley v. Holt*, No. 03A01-9807-PB-00220, 1999 Tenn. App. LEXIS 247, at *12 (Tenn. Ct. App. Apr. 15, 1999); *see also Smith v. Smith*, 102 S.W.3d 648, 653 (Tenn. Ct. App. 2002).

Once a presumption of undue influence arises, in order to overcome the presumption, the dominant party must establish that the transaction at issue was fair by clear and convincing evidence. *In re Estate of Hamilton*, 67 S.W.3d at 793. With a will contest, evidence that the testator received independent, legal advice concerning the contents of a will may rebut this presumption. *Id*. (citing *Crain*, 823 S.W.2d at 194). Finally, we are mindful that "the presumption of undue influence extends to all dealings between persons in fiduciary and confidential relations, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party." *Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979) (citing *Williams v. Jones*, 388 S.W.2d 665 (Tenn. Ct. App. 1963); *Roberts v. Chase*, 166 S.W.2d 641 (Tenn. Ct. App. 1942)).

The trial court denied the Appellants' motion for directed verdict on the issue of whether a confidential relationship was established such that the burden would shift to the Appellees to show the fairness of the transaction. We disagree. In this case, it is undisputed that the Appellees were Decedent's attorneys-in-fact from August 1996 until her death in August 2000. It is also undisputed that the two powers of attorney naming the Appellees Decedent's attorneys-in-fact were in effect upon execution. Further, there is no dispute that the Appellees exercised their authority under the powers of attorney.[7] Finally, there is no question that the change of ownership of the bank accounts and certificates of deposit from Decedent's sole ownership to joint ownership with the Appellees giving them a right of survivorship benefitted the Appellees.

The Appellees argue that the denial of the Appellants' motion for directed verdict was proper because the power of attorney was "restricted" since the Appellees were prohibited from "changing the ownership status of any property." The Appellees further argue that denial of Appellants' motion for directed verdict was proper because they did not exercise the power of attorney to change the ownership status of Decedent's CD's or bank accounts, and, therefore, in accordance with *Childress v. Currie*, 74 S.W.3d 324 (Tenn. 2002), no confidential relationship existed because they did not exercise any power of attorney to change the ownership status of the CD's or bank accounts. We disagree.

First, as support for the argument that the power of attorney in effect in this case was "restricted" because the Appellees did not have the power to change the ownership status of any of

___

[7] In Ms. Kemp's deposition testimony which was read into the record, she admits that she signed the documents to renew the CD's as Decedent's attorney-in-fact. Ms. Kemp also admitted in her trial testimony that she signed renewal documents for Decedent's CD's pursuant to her authority under the power of attorney. Additionally, Mr. Kemp signed documents as Decedent's attorney-in-fact. One such example includes a disclosure statement for a CD with Citizens Bank & Trust dated March 23, 2000. Such statement names Mr. and Ms. Kemp joint owners with Decedent and grants them a right of survivorship. Mr. Kemp confirmed that he signed this document as Decedent's attorney-in-fact in his trial testimony.

Decedent's property, the Appellees cite this Court's decision of *In re Estate of Coggins*, No. 03A01-9604-PB-00131, 1996 WL 571510 (Tenn. Ct. App. Oct. 3, 1996). However, that case did not address the question of whether the absence of a power of changing a principal's ownership status of property creates a "restricted" power of attorney for purposes of establishing a confidential relationship. Rather, in that case, this Court addressed the issue of whether an attorney-in-fact held the authority under a power of attorney to change the ownership status of the principal's property to joint ownership with the attorney-in-fact. *In re Estate of Coggins*, 1996 WL 571510, at *1. After our review of Tennessee jurisprudence, we cannot say that the power of attorney in this case is "restricted," and therefore that the presumption of undue influence does not arise when the attorney-in-fact lacks a power to change the ownership status of the principal's property.

Second, the Appellees argue that because they did not use their authority under the power of attorney to convert Decedent's property to joint ownership, the power of attorney was not exercised to create a confidential relationship in accordance with the Tennessee Supreme Court's decision in *Childress v. Currie*, 74 S.W.3d 324 (Tenn. 2002). However, in *Childress v. Currie*, the court did not hold, as the Appellees contend, that a power of attorney that is executed and exercised, but not exercised to convert assets to joint ownership, does not create a confidential relationship such that the presumption of undue influence arises. *Childress*, 74 S.W.3d at 329. Rather, the court held that "[w]hen an unrestricted power of attorney is executed but has not yet been exercised, good sense dictates that there exists no dominion and control and therefore no confidential relationship based solely on the existence of the power of attorney." *Id.* Unlike the case at bar, the Tennessee Supreme Court in *Childress v. Currie* addressed a situation where a power of attorney had been executed but never exercised. *Id.* at 325. In this case, it is undisputed that the Appellees exercised the power of attorney.

The Appellees further argue that relationships between family members do not establish a confidential relationship *per se*. It is true that the relationships between family members and relatives are not by themselves confidential relationships. *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989) (citing *Halle v. Summerfield*, 287 S.W.2d 57, 61 (Tenn. 1956); *Harper v. Watkins*, 670 S.W.2d 611, 628 (Tenn. Ct. App. 1983)). However, the Appellants in this case do not rely on the familial relationship between the Appellees and Decedent to establish a confidential relationship *per se*. Rather, the Appellants rely on the rule that an executed, unrestricted power of attorney establishes a confidential relationship *per se*. Therefore, such rule is inapplicable to this case, and this argument has no merit. Though it is rare for a court to grant a plaintiff's motion for directed verdict, we believe that the trial court should have granted the Appellants' motion in this case given the undisputed facts. However, the error created by the trial court's failure could have been cured by a proper jury instruction. Therefore, we now examine the instructions given to the jury by the trial court to determine if such instructions constitute reversible error.

**Jury Instructions on the Presumption of Undue Influence**

-9-

The Appellants argue that the trial court aggravated the error of denying their motion for directed verdict by misinforming the jury about how a power of attorney can create a confidential relationship *per se*, such that the presumption of undue influence is raised and the burden is shifted to the Appellees to prove the fairness of the transactions at issue by clear and convincing evidence.

As an initial matter, we note that

> [w]hen the alleged error concerns a jury instruction actually given to the jury, there is no requirement that the appropriate instruction be provided to the trial court. In fact, there is no duty to object to the instruction at trial (although the better practice certainly would be to point out any problem to the trial court).

*In re Estate of Calfee*, No. E-2000-01720-COA-R3-CV, 2001 Tenn. App. LEXIS 404, at *9 (Tenn. Ct. App. May 31, 2001) (citing *Grandstaff v. Hawks*, 36 S.W.3d 482, 489 (Tenn. Ct. App. 2000)). There is no requirement that a motion for new trial be filed stating the specific objectionable material. *Id*. Though not required, the Appellants set forth their objections to the trial court's jury instructions in their motion for a new trial. Additionally, for this Court to review the propriety of a trial court's instructions to a jury, such instructions must be made a part of the record. *In re Estate of Elam*, No. 85-15-II, 1985 Tenn. App. LEXIS 3283, at *8-9 (Tenn. Ct. App. Nov. 27, 1985). In the present case, such instructions were included in the record on appeal.

In this case, the jury instruction at issue is Jury Instruction No. 29 in which the trial court instructed the jury as follows:

> An unrestricted power of attorney, in and of itself, creates a confidential relationship between the parties.

> An unrestricted power of attorney, however, does not, in and of itself, create a confidential relationship between the parties if the attorney in fact did not exercise the power or was not aware of the power.

> A general clause in a power of attorney given for a specific purpose, authorizing the agent to do "any and every act" in the principal's name which he could do in person, must be construed to relate to the specific purpose, and does not constitute such agent a general agent. **In re estate of Coggins (Ct. App. 1996)**

> Tennessee law as found in T.C.A. 34-6-108(c) provides:

(c) Nothing contained in this section and "34-6-109 shall be construed to vest an attorney in fact with, or authorize an attorney in fact to exercise, any of the following powers:

(1) Make gifts, grants, or other transfers without consideration, except in fulfillment of charitable pledges made by the principal while competent;

(2) Exercise any powers of revocation, amendment, or appointment which the principal may have over the income or principal of any trust;

(3) Act on behalf of the principal in connection with any fiduciary position held by the principal, except to renounce or resign such position;

(4) Exercise any incidents of ownership on any life insurance policies owned by the principal on the life of the attorney in fact;

(5) Change beneficiary designations on any death benefits payable on account of the death of the principal from any life insurance policy, employee benefit plan, or individual retirement account;

(6) Change, add or delete any right of survivorship designation on any property, real or personal, to which the principal holds title, alone or with others;

(7) Renounce or disclaim any property or interest in property or powers to which the principal may become entitled, whether by gift or testate or intestate succession;

(8) Exercise any right, or refuse, release or abandon any right, to claim an elective share in any estate or under any will; or

(9) Make any decisions regarding medical treatments or health care, except as incidental to decisions regarding property and finances.

In the case before you, *if you find that the power of attorney granted by Mamie Fesmire to Jerry Kemp and Annie Jo Kemp does Not include any or all of the above provisions, then the power of attorney is restricted and is not an unrestricted power of attorney*. Therefore, the presumption of undue influence would not arise. As it relates to power of attorney, the presumption of undue influence arises only when the power of attorney is an unrestricted power of attorney.

(emphasis added).

Our review of Tennessee case law reveals no requirement that a power of attorney must include "any or all" of the provisions listed in Tenn. Code Ann. § 34-6-108(c) (2001) in order to be "unrestricted" for purposes of creating a confidential relationship and raising the presumption of undue influence. Therefore, we conclude the trial court committed reversible error by providing the jury with a checklist of powers needed to create an "unrestricted" power of attorney and a confidential relationship. It follows that, because the jury was misled as to how a confidential

-11-

relationship can be created by a power of attorney, the presumption of undue influence could not have been raised, causing the burden to shift to the Appellees to prove the fairness of the transactions by clear and convincing evidence. For these reasons, we reverse the trial court's denial of the Appellants' motion for a new trial and remand for a new trial. As a result of our disposition on this issue, the Appellants final two issues are pretermitted.

## Conclusion

For the reasons stated above, we reverse and remand this case for further proceedings consistent with this opinion. Costs of this appeal are taxed to the Appellees, Jerry Donald Kemp and Annie Jo Kemp, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE